**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FILED
United States Court of
Appeals
Tenth Circuit

**November 15, 2024**

**Christopher M. Wolpert
Clerk of Court**

JONATHAN O. HAFEN, in his
capacity as Court-Appointed Receiver,

Plaintiff - Appellee,

v.

GRETCHEN A. HOWELL, an
individual; LESLIE M. HOWELL, an
individual,

Defendants - Appellants.

No. 23-4116

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:19-CV-00813-TC)**
_____

Matthew M. Boley, Cohne Kinghorn, P.C., Salt Lake City, Utah, for
Defendants-Appellants.

Jeffrey A. Balls (Joseph M.R. Covey and Matthew J. Ball, with him on the
brief), Parr Brown Gee & Loveless, Salt Lake City, Utah, for Plaintiff-
Appellee.

_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Lured by the promise of a secure and exclusive investment opportunity, Les and Gretchen Howell made substantial investments in the Silver Pool, a silver-trading scheme operated by Gaylen Rust through his business, Rust Rare Coin. Though Gretchen was about $75,000 short of recovering her investment when the government shut down the scheme, Les did far better. After about ten years of investing, he profited about $3.2 million above his roughly $1.2 million investment. He took his distributions and bought land in Kingman, Arizona. There, he built a house where he lives with Gretchen. Though we are uncertain when he did so, Les made Gretchen a joint tenant with himself, gifting her a one-half share in the property.

About a decade after Les began investing, the Silver Pool and Rust Rare Coin were exposed as a Ponzi scheme. The Commodity Futures Trading Commission ("CFTC") brought an enforcement action against the operator of the scheme, Gaylen Rust, and the district court appointed Jonathan O. Hafen as receiver to recover assets fraudulently transferred through the scheme.

As the receiver, Hafen brought this ancillary action against Les and Gretchen under Utah's Uniform Voidable Transactions Act ("UVTA"), seeking to recover the $3.2 million in profit that Les made from the scheme, by asserting claims of fraudulent transfer and unjust enrichment. The district court granted Hafen summary judgment against Les and Gretchen on the fraudulent-transfer claims. It declined to reach the unjust-enrichment claims because the

2

fraudulent-transfer ruling gave Hafen complete relief. The district court entered a judgment against Les and Gretchen for Les's profit. The judgment noted that it included the funds Les transferred to Gretchen by giving her joint title in the Kingman property.

Both parties filed motions under Federal Rule of Civil Procedure 59(e). Hafen sought prejudgment interest, which the district court granted at a 5% interest rate. The Howells sought reconsideration of the summary-judgment order and clarification on the scope of Gretchen's liability. The district court denied the Howells' motion, but clarified that Gretchen was liable for half the $3 million that Les spent on the Kingman property. Consistent with those orders, the district court entered an amended judgment that awarded Hafen prejudgment interest and clarified that Gretchen was liable for $1.5 million of the total money judgment.

The Howells appeal the district court's grant of summary judgment to Hafen, the calculation of the judgment against each of them, and the award of prejudgment interest to Hafen. Exercising our appellate jurisdiction under 28 U.S.C. § 1291,[1] we agree that the district court erred in calculating the

---

[1] Our subject-matter jurisdiction derives from the CFTC enforcement action, which was brought under the Commodities Exchange Act. *See* 7 U.S.C. § 13a-1; *see also Commodity Futures Trading Comm'n v. Rust Rare Coin*, No.
(*footnote continued*)

3

judgment against Gretchen, so we reverse and remand for further proceedings to recalculate the amount of the judgment against her. We otherwise affirm the district court.

## BACKGROUND

### I.    Factual Background

Promising substantial and consistent returns, Gaylen Rust, the owner and operator of Rust Rare Coin, lured investors to put their money in a silver-trading Ponzi scheme that he called "the Silver Pool."[2] To explain his success, he represented that he had created an algorithm that allowed him to trade silver profitably whether the market was up or down. And to placate any investors' concerns, he claimed he traded only one-half of the silver at a time and stored the rest of the silver at a Brink's storage facility. Of course, nearly all this story was a lie. In fact, the Silver Pool was insolvent. An investigation revealed that

---

2:18-CV-892-TC-DBP, at 6 ¶ 9 (D. Utah Dec. 6, 2018) (ECF No. 56). A receiver appointed in such an action may bring ancillary state-law claims in federal court against individuals alleged to have received unlawful transfers. 28 U.S.C. §§ 754, 1367(a); *Klein v. Cornelius*, 786 F.3d 1310, 1315 (10th Cir. 2015) (federal courts have jurisdiction over ancillary state-law claims); *see Klein v. Roe*, 76 F.4th 1020, 1029 (10th Cir. 2023) (receiver has standing to recover fraudulent transfers).

[2] The parties' briefing and the district court's memorandum opinion use the names Rust Rare Coin and the Silver Pool interchangeably. The record reveals that Rust was running a few schemes through Rust Rare Coin but eventually consolidated them in the Silver Pool. This opinion generally matches the naming convention used in the parties' briefing and the district court's memorandum opinion.

Gaylen Rust never traded or stored silver, and that the Silver Pool generated no revenue. Instead, Rust was churning the new investments to pay returns to earlier investors, the hallmark of a Ponzi scheme.[3]

Two of Rust's investors were Les and Gretchen Howell. Throughout their twenty-five years of marriage, the couple kept their finances separate; they invested in the scheme separately too. Beginning in 2008 and continuing for around a decade, Les invested nearly all his assets into Rust Rare Coin. All told, he invested about $1.2 million in the scheme, and he received about $3.2 million in profits. *See Hafen v. Howell*, No. 2:19-CV-00813-TC-DAO, 2023 WL 2188566, at *11–12 (D. Utah Feb. 23, 2023). These gains enabled Les to retire early from his job, buy land in Kingman, Arizona, and begin building a house there. He spent at least $3 million of his distributions from the scheme to buy the land and to build the house.

Soon after Les began investing in Rust Rare Coin, Gretchen did so too, investing $96,450 into the scheme. But the scheme ended with her having received just $22,000 in distributions, resulting in a $74,450 loss. Though she

---

[3] "Ponzi schemes are fraudulent business ventures in which investors' returns are generated by capital from new investors rather than the success of the underlying business venture. This results in a snowball effect as the creator of the Ponzi scheme must then recruit even more investors to perpetuate the fraud." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1195 n.1 (10th Cir. 2022) (internal quotation marks omitted).

was a "net loser" in the scheme, Les gave her joint title in the Kingman property, and the couple has lived in the home since 2018.

## II.   Procedural Background

In November 2018, the CFTC and the State of Utah filed a complaint against Gaylen Rust and others, alleging that Rust Rare Coin had defrauded investors. *Commodity Futures Trading Comm'n v. Rust Rare Coin*, No. 2:18-CV-00892-TC-DBP (D. Utah Nov. 13, 2018) (ECF No. 1).[4] Soon after, the court appointed Jonathan Hafen as receiver for Rust Rare Coin. Hafen is responsible for preserving the assets of the estate, including by clawing back funds fraudulently transferred.

In May 2019, a federal grand jury returned an indictment charging Gaylen Rust for his role in the scheme to defraud investors through Rust Rare Coin. *See United States v. Rust*, No. 2:19-CR-00164-TS-CMR-1 (D. Utah May 8, 2019) (ECF No. 1). In December 2021, Rust pleaded guilty, admitting that the Silver Pool was a fraudulent scheme.

In October 2019, Hafen filed this ancillary action, seeking to recover funds transferred to the Howells. In the complaint, he asserted two claims against Les and Gretchen: fraudulent transfer and unjust enrichment, and moved for summary judgment. The district court granted Hafen summary

---

[4] We can take judicial notice of publicly filed court records. *See United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

6

judgment on the fraudulent-transfer claim. *See Hafen*, 2023 WL 2188566, at *12–13. Because those claims gave Hafen complete relief, the court chose not to reach the unjust-enrichment claims. *See id.* at *13 n.22.

The district court entered judgment against Les and Gretchen for $3,218,103.96, Les's total "net profits."[5] The court noted that the judgment "includes the funds . . . transferred to Gretchen . . . by titling their Kingman, Arizona property in her name as well as his own, which Gretchen . . . must disgorge."

Both parties moved to amend or alter the judgment under Rule 59(e). Hafen sought prejudgment interest, which the district court granted. *See Hafen v. Howell*, No. 2:19-CV-00813-TC, 2023 WL 5000944, at *5–7 (D. Utah Aug. 4, 2023). Gretchen sought clarification on whether the judgment against her was a money judgment or was instead a judgment against her interest in the Kingman property. The district court denied their Rule 59(e) motion but clarified that the judgment against Gretchen was a money judgment for $1.5 million, that is, half of Les's fraudulent earnings that he spent on the Kingman property. *See id.* at *3–5. The Howells timely appealed the amended judgment.

---

[5] Though not detailed in the district court's memorandum opinion, that figure discounts Gretchen's loss: $4,511,000 (Les's distributions) - $1,218,446.04 (Les's investment) - $74,450 (Gretchen's loss) = $3,218,103.96. *See Hafen*, 2023 WL 2188566, at *11–12.

## DISCUSSION

Across their seven appellate issues, the Howells challenge nearly every aspect of the district court's orders and judgments.[6] Those seven issues are as follows:

1. Whether the Ponzi presumption is valid under Utah law;

2. Whether the district court relied on inadmissible evidence to grant Hafen summary judgment;

3. Whether the district court erred in denying Les's claim for prejudgment interest;

4. Whether the district court erred in finding Les's transfer of a one-half interest in the Kingman property to Gretchen was voidable under Utah's Uniform Voidable Transactions Act ("UVTA");

5. Whether the district court erred in finding that Les's investment in the Kingman property was recoverable through Gretchen;

---

[6] The Howells also argue that disputed facts preclude summary judgment on the unjust-enrichment claim. But the district court reserved ruling on those claims, so that argument is not before us. The district court did so because Hafen received complete relief through the fraudulent-transfer claims, and an unjust-enrichment claim under Utah law generally provides a remedy where one does not exist at law. *Hafen*, 2023 WL 2188566, at *13 n.22; *see Bivens v. Salt Lake City Corp.*, 416 P.3d 338, 350–51 (Utah 2017). Though the district court left those unjust-enrichment claims undecided, we still have appellate jurisdiction under 28 U.S.C. § 1291 because the order finally disposed of the case such that it is not subject to further proceedings in federal court. *Jackson v. Volvo Trucks N. Am., Inc.*, 462 F.3d 1234, 1238 (10th Cir. 2006). And the court clearly understood the judgment to resolve all issues before the court, treating the unjust-enrichment claim as being mooted by the judgment on the fraudulent-transfer claim.

6. Whether there was sufficient evidence to support the $1.5 million judgment against Gretchen; and

7. Whether the district court erred in granting Hafen's motion to amend the judgment with an award of prejudgment interest.

We agree with the Howells that the district court erred in entering judgment against Gretchen for $1.5 million. Rather than rely on the value of the property when it was transferred to Gretchen, the court relied on the $3 million that Les had invested in the property, in which Gretchen never had an interest. But we disagree with the Howells on their other arguments. So we reverse and remand for further proceedings to determine the value of Gretchen's interest in the Kingman property when it was transferred to her. We otherwise affirm the district court.

## I.    Validity of the Ponzi Presumption

Utah law generally allows a creditor to void a debtor's transfer if the creditor can show that the transfer was fraudulent. As is relevant here, under the UVTA, the general rule is that a creditor can void a debtor's transfer by showing by a preponderance of the evidence that the debtor made the transfer (1) "with actual intent to hinder, delay, or defraud any creditor of the debtor" or (2) "without receiving a reasonably equivalent value in exchange for the transfer or obligation." Utah Code Ann. § 25-6-202(1), (3) (West 2024). But even if a debtor makes a transfer with an actual intent to defraud a creditor, the transfer is not voidable against the recipient if the recipient shows by a

9

preponderance of the evidence that he took the transfer (1) "in good faith" and (2) "for a reasonably equivalent value." *Id.* § 25-6-304(1), (10).

But if a creditor (or in this case the receiver, who stands in the creditor's shoes) can show that the debtor operated a Ponzi scheme, the law presumes the debtor's transfers were fraudulent. *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022). This is known as the "Ponzi presumption."[7] *Id.* at 1198. A Ponzi scheme is a fraudulent enterprise that generates no revenue but gives its investors the appearance of legitimacy by paying returns with new investors' money. To keep the Ponzi scheme going, its operator must keep recruiting new, unwitting investors. *Id.* at 1195 n.1.

Before the district court, Hafen argued that the Silver Pool was a Ponzi scheme, making all the transfers to Les and Gretchen presumed fraudulent. The district court agreed, finding no genuine dispute of material fact about whether the Silver Pool was a Ponzi scheme. So the court applied the Ponzi presumption and presumed that all distributions to Gretchen and Les were fraudulent. *Hafen*, 2023 WL 2188566, at *8–9, *12. Les and Gretchen rebutted that presumption for the distributions they received that did not exceed their initial investment

---

[7] Though many states apply the presumption to their uniform act, *see, e.g.*, *Lewis v. Taylor*, 375 P.3d 1205, 1208 (Colo. 2016); *Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 862 n.6 (8th Cir. 2015) (collecting cases), at least two states have declined to apply the presumption to their uniform act, *Finn v. All. Bank*, 860 N.W.2d 638, 647 (Minn. 2015); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 581 (Tex. 2016).

(about $1.2 million for Les and $22,000 for Gretchen), because those distributions were exchanged for reasonably equivalent value. *Id.* at *11–12; § 25-6-202(1).

Before us, the Howells argue that the UVTA's language precludes a Ponzi presumption. At oral argument, they represented that this was a question of first impression because we have applied the Ponzi presumption only to the UVTA's predecessor, Utah's Uniform Fraudulent Transfer Act ("UFTA"). But as they conceded at oral argument, they did not challenge the validity of the presumption before the district court because they thought the district court would find the argument unpersuasive. In other words, they argue this point for the first time on appeal and we consider it waived. *Richison v. Ernest Grp. Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011) (concluding that a party waives an issue by "intentionally relinquish[ing] or abandon[ing]" it).

But we will clarify that this would not be a question of first impression if it were properly raised. When confronted in the past with whether our UFTA-Ponzi-presumption case law applies to the UVTA, we have assumed it does without saying so. For example, in a recent published decision, we described one of our UFTA decisions applying the Ponzi presumption as a UVTA case. *See Klein v. Roe*, 76 F.4th 1020, 1032 n.6 (10th Cir. 2023). And in an unpublished decision, we affirmed the application of the Ponzi presumption to a

11

UVTA case like this one. *See Klein v. Shepherd*, No. 21-4064, 2023 WL 4542160, at *2, *7 (10th Cir. July 14, 2023).

So we make it clear that our UFTA case law applying the Ponzi presumption extends to the UVTA. Though the UVTA added language regarding the creditor's burden to prove the elements of a claim and a third-party transferee's burden to prove an affirmative defense, the Ponzi presumption depends on transfers being made with an actual intent to defraud. *Compare* Utah Code Ann. § 25-6-5 (West 2016), *with id.* § 25-6-202(3) (West 2024), *and id.* § 25-6-6 (West 2016), *with id.* § 25-6-203(3) (West 2024); *see Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015). And the UVTA preserved that requirement. *Compare* § 25-6-5(1)(a) (West 2016), *with* § 25-6-202(1)(a) (West 2024).

## II.    The Howells' Evidentiary Arguments

The Howells argue the district court relied on inadmissible evidence in granting Hafen summary judgment. The Howells challenge the court's reliance on Gaylen Rust's statements and the evidentiary submissions from three witnesses. "We review a district court's evidentiary determinations when resolving a motion for summary judgment—including the decision to treat submissions as competent evidence—for an abuse of discretion." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021). That includes the

admission or exclusion of expert testimony. *Vincent v. Nelson*, 51 F.4th 1200, 1212–13 (10th Cir. 2022).

### A.    Gaylen Rust's Statements

Before Gaylen Rust pleaded guilty to conspiracy to commit wire fraud, conspiracy to commit money laundering, and securities fraud, he spoke with investigators, law enforcement, and the sentencing court about how he operated Rust Rare Coin. The reports and declarations submitted in support of Hafen's motion for summary judgment quote some of those statements. Before us, the Howells argue that Rust's statements are inadmissible hearsay and that the district court erred by relying on them.

Though the district court found that Rust's statements "confirmed" its finding that the Silver Pool operated as a Ponzi scheme, it noted that it didn't need Rust's statements to make that finding. *Hafen*, 2023 WL 2188566, at *10 ("But even without the information from Mr. Rust's statements—either as they are included in the Receiver's experts reports and declarations, or as they were made in his Fed. R. Crim. P. 11(c)(1)(C) plea—the undisputed facts from other sources provide enough support for the Ponzi scheme determination." (footnote omitted)). So without deciding whether Rust's statements would be admissible, we conclude that the Howells' argument fails because the district court's decision did not depend on the challenged statements.

**B.     Witness Reports**

The Howells make several challenges to the three witness reports or declarations in this case: (1) the expert report of Jonathan O. Hafen, the receiver in this case; (2) the expert report of D. Ray Strong, an accountant and fraud examiner; and (3) the report and declaration of Jeffrey T. Shaw, another accountant and fraud examiner.[8] We first address the challenges that are common to witnesses, then we address remaining arguments specific to each witness.

***Personal Knowledge.*** The Howells argue that because Hafen, Shaw, and Strong lack any involvement in Rust Rare Coin (through personal involvement in any of the transactions or as employees), they lack personal knowledge about the scheme and their testimony is therefore inadmissible. But as the district court correctly noted, a declarant can obtain personal knowledge by reviewing underlying documents used to prepare a report or declaration. *Hafen v. Howell*, No. 2:19-CV-00813-TC-DAO, 2022 WL 1643839, at *2 (D. Utah May 24, 2022); *see Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1123 (10th Cir. 2005) (holding that a declarant had personal knowledge of the contents of audit

---

[8] The district court addressed the challenges to Hafen and Strong's reports in its summary-judgment memorandum opinion, *see Hafen*, 2023 WL 2188566, at *2–5, and the challenges to Shaw's report and declaration in an earlier memorandum opinion, *Hafen v. Howell*, No. 2:19-CV-00813-TC-DAO, 2022 WL 1643839 (D. Utah May 24, 2022).

reports because she reviewed them to prepare her declaration). So the portions of each report and declaration that analyze documents or summarize reports are indeed based on each witness's personal knowledge. *See Bryant*, 432 F.3d at 1123.

***Ultimate Issue.*** The Howells also argue that Hafen and Strong's expert reports are inadmissible because they offer an opinion on the ultimate issue—whether the Silver Pool was a Ponzi scheme. But the district court granted the Howells the relief they seek, refusing to rely on either opinion to the extent that it "reach[es] the legal conclusion of whether the circumstances of the RRC scheme amount to an illegal Ponzi scheme." *Hafen*, 2023 WL 2188566, at \*3, \*5. So the court did not abuse its discretion.

***Testimony Unhelpful to the Jury.*** Finally, the Howells argue that Hafen and Strong's reports would not help a jury, because neither witness analyzed the Howells' specific transactions with Rust Rare Coin. Those arguments come too late. Because they did not make those arguments before the district court, and because they raise them for the first time on appeal in their reply brief, the arguments are not properly before us. *ORP Surgical, LLC v. Howmedica Osteonics Corp.*, 92 F.4th 896, 923 (10th Cir. 2024); *WildEarth Guardians v. U.S. Env't Prot. Agency*, 770 F.3d 919, 933 (10th Cir. 2014) (holding that generally a party waives an argument raised for the first time in a reply brief).

15

### 1.    Hafen's Expert Report

The Howells challenge Hafen's report on two other grounds: (1) that he is not an expert on Ponzi schemes, and (2) that he relied on hearsay statements. We will address each argument in turn.

***Ponzi Scheme Expert.*** Federal Rule of Evidence 702(a) permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to testify to an opinion if the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." The district court concluded that Hafen was qualified to testify as an expert on Ponzi schemes because of his "specialized knowledge of the mechanics of Ponzi schemes" drawn "from his lengthy representation" of Ponzi-scheme victims. *Hafen*, 2023 WL 2188566, at *2. And the district court concluded that those opinions would help a lay jury understand the mechanics of a sophisticated Ponzi scheme. *Id.* at *3.

Before us, the Howells provide a single conclusory sentence saying that Hafen is not qualified to testify as an expert in Ponzi schemes. They present no other argument demonstrating that the district court abused its discretion, and we will not come up with one for them. So we affirm the district court's decision to treat Hafen as an expert in Ponzi schemes.

***Reliance on Hearsay.*** The Howells' final challenge to Hafen's report is that it relies on hearsay, including documents and interviews Hafen knows

16

about "only third-hand." At summary judgment, a party may present evidence in a form that is inadmissible at trial so long as it can be reduced to an admissible form at trial. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). At trial, an expert may testify to an opinion based on inadmissible evidence, such as hearsay, so long as experts in their field would reasonably rely on that kind of data. *See* Fed. R. Evid. 703; *see also Black v. M & W Gear Co.*, 269 F.3d 1220, 1229 (10th Cir. 2001).

Relying on this legal background, the district court considered Hafen's report at summary judgment because the substance of his report "may be presented at trial in an admissible form through Mr. Hafen's testimony." *Hafen*, 2023 WL 2188566, at *3. On appeal, the Howells simply repeat their argument that the report contains hearsay and fail to argue how the district court's reliance on the report was an abuse of discretion. That argument does not persuade us that the district court abused its discretion.

### 2.    Strong's Expert Report

The Howells also challenge Strong's expert report on the ground that his testimony relies on incomplete and unreliable data in violation of Federal Rule of Evidence 702(b). Federal Rule of Evidence 702(b) requires that expert testimony be based on "sufficient facts or data." The district court found that although Strong did not rely on a completely comprehensive record, he and his team analyzed extensive records including bank records, emails, and third-party

17

documents. *See id.* at *4. Before us, the Howells simply repeat their bare conclusion, not explaining how the district court abused its discretion. Here too, we affirm the reliance on Strong's expert report.

### 3.    Shaw's Declaration

Finally, the Howells challenge Shaw's declaration on two other grounds: that he was not disclosed as an expert and that his report contains inaccuracies. First, as the district court made clear, Shaw was offered as a fact witness, not as an expert. *Hafen*, 2022 WL 1643839, at *1. So Hafen had no need to disclose Shaw as an expert. Second, the Howells argue Shaw's declaration contains accounting inaccuracies. The district court reasoned that because the declaration is admissible as a summary or calculation of voluminous records under Federal Rule of Evidence 1006, any inaccuracies go to the weight of the evidence. *Id.* at *2; Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."). Though a summary should not be admitted under Federal Rule of Evidence 1006 if it mischaracterizes or inaccurately reflects the underlying documents, it's within the district court's discretion to determine whether there's enough evidence to support the summary. *State Off. Sys., Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843, 846 (10th Cir. 1985). But if a party's objections relate to the proponent's

conclusions, those objections go more to the weight of the evidence than to its admissibility. *Id.*

Here too, the Howells never explain how the district court abused its discretion. Though the Howells offer us conclusions in their opening brief, in their reply brief they argue Shaw drew the wrong conclusions about how much Les and Gretchen profited from the scheme. So that objection goes to the weight of the evidence, not its admissibility. *See id.* The district court did not abuse its discretion in relying on Shaw's declaration.

## III.    Les was not a creditor of Rust Rare Coin.

The district court found it undisputed that Les received at least $3.2 million in profits. *Hafen*, 2023 WL 2188566, at *12. The Howells argue that this amount is too high. They contend that Les was a creditor of Rust Rare Coin for his principal investment and thus entitled under Utah law to prejudgment interest at a rate of 10% per year on that initial investment. For support, the Howells cite the current version of § 15-1-1 of the Utah Code, which allows a 10% per year interest rate for breaches of contracts in which the parties have agreed that an interest rate applies but have not specified a rate. Utah Code Ann. § 15-1-1 (West 2024).

The district court rejected that argument, reasoning that the current version of § 15-1-1 became effective after Les made his investments and does not apply retroactively. *Hafen*, 2023 WL 2188566, at *11 & n.19. The district

19

court explained that the version of § 15-1-1 in effect during Les's investments states only that "the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." Utah Code Ann. § 15-1-1 (West 2019). And the court noted that the Howells had failed to argue how Les's investments were a loan or forbearance. *Hafen*, 2023 WL 2188566, at *11 n.19.

"We review a district court's decision granting summary judgment de novo, resolving all factual disputes and drawing all reasonable inferences in favor of the non-moving party." *Argo*, 452 F.3d at 1199 (emphasis omitted).

The Howells offer us the same argument they did to the district court, ignoring the statutory shortcomings the district court identified. In addition to those statutory shortcomings, Les has not shown he was damaged or that he has a judgment against Rust Rare Coin from which prejudgment interest would accrue. *AE, Inc. v. Goodyear Tire & Rubber Co.*, 576 F.3d 1050, 1055–56 (10th Cir. 2009). Because the Howells have failed to show Les has a right to interest on his principal investment, we reach the same conclusion as the district court and affirm the denial of prejudgment interest for Les.

## IV.  Prejudgment Interest for Hafen

After the district court entered judgment against Les and Gretchen, Hafen filed a motion under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment to include prejudgment interest. Relief under Rule 59(e) "is

20

available in limited circumstances, including (1) an intervening change in the controlling law, (2) when new evidence previously was unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Hayes Fam. Tr. v. State Farm Fire & Cas. Co.*, 845 F.3d 997, 1004 (10th Cir. 2017) (cleaned up).

Relying on the manifest-injustice avenue, Hafen argued that a failure to award him prejudgment interest would allow the Howells to enjoy the fraudulent conveyances as an interest-free loan at the expense of the scheme's victims. The district court agreed and awarded Hafen a 5% interest rate, relying on an unpublished decision from this court that affirmed a similar award. *Hafen*, 2023 WL 5000944, at *5–6; *see Wing v. Gillis*, 525 F. App'x 795, 801–02 (10th Cir. 2013) (holding that a district court did not abuse its discretion in awarding 5% prejudgment interest to the receiver in a Ponzi-scheme-ancillary action). The district court entered an amended judgment to reflect the award of prejudgment interest. *Hafen*, 2023 WL 5000944, at *7.

We review a ruling on a Rule 59(e) motion for an abuse of discretion. *Nelson v. City of Albuquerque*, 921 F.3d 925, 929 (10th Cir. 2019). An award of prejudgment interest is within the district court's discretion. *See AE, Inc.*, 576 F.3d at 1055. Under Utah law, prejudgment interest is appropriate if the damage is complete, the amount of loss is fixed as of a particular time, and the

21

loss is measurable by facts and figures.[9] *See id.* "[T]he purpose of awarding prejudgment interest is to compensate a party for the depreciating value of the amount owed over time . . . ." *Id.* at 1056 (internal quotation marks omitted).

On appeal, the Howells argue the district court erred by allowing prejudgment interest despite Hafen's delay in requesting it. But they make no argument explaining why this delay should prevent relief where the district court relied on the manifest-injustice avenue. *See Hayes Fam. Tr.*, 845 F.3d at 1004. They also dispute the 5% interest rate, arguing that the rate "should have been limited to the post-judgment interest rate then applicable." They cite no authority to support that position.

At bottom, the Howells fail to present a cogent argument that the district court abused its discretion in granting Hafen's Rule 59(e) motion and awarding him prejudgment interest. So we affirm the district court's award of prejudgment interest.

## V.   The Judgment Against Gretchen

We next consider the district court's entry of judgment against Gretchen. Because Gretchen lost about $75,000 in the Ponzi scheme, the district court denied Hafen's motion for summary judgment to the extent that he sought to

---

[9] Because this case is before us under our ancillary jurisdiction, state law governs an award of prejudgment interest. *See Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1126 (10th Cir. 2003); *Cornelius*, 786 F.3d at 1315. And the parties do not dispute that Utah law applies.

recover the $22,000 of distributions she received from the scheme because it was less than her initial investment. *Hafen*, 2023 WL 2188566, at *12. Hafen does not challenge that ruling on appeal. But she is still responsible for the value of Les's gift to her of joint tenancy in the Kingman property. Recall that Les used his distributions from the scheme to buy land in Kingman, Arizona, and build a house. *Hafen*, 2023 WL 2188566, at *7. He gave Gretchen joint title in the property. *Id.* at *12–13. So the district court held that under Utah law, Gretchen was a transferee of the voidable profits that Les put in the Kingman property. *Id.* at *13.

Les was the first transferee of the $3.2 million of voidable funds. Utah Code Ann. § 25-6-304(2)(b) (West 2024). And he invested at least $3 million of voidable funds into the Kingman property and gifted to Gretchen joint title in the property, making Gretchen an immediate or mediate transferee who did not take for value. *Id.*; § 25-6-304(3). The asset she received from Les was an interest in the Kingman property, not the funds Les put into the property. That's so because Gretchen never had an interest in the $3 million of voidable funds; he obtained his profits from his own investments and held the profits in his own banking account. Gretchen had only a joint interest in the property, whatever its value. Thus, the UVTA requires that the judgment against her equal the value of her interest in the property at the time it was transferred to

her. § 25-5-304(2)(b), (3). With that background, we'll turn to the Howells' arguments.

The Howells argue the district court erred in several ways. Three of those arguments can be dispensed with quickly. First, they argue the district court entered judgment against Gretchen only because she is Les's spouse, in violation of Utah law that prevents a creditor from reaching a spouse's assets to satisfy a debt of the other spouse. But the district court entered judgment against Gretchen not because she was Les's spouse, but because she was a transferee of a voidable transaction. *Hafen*, 2023 WL 2188566, at *12; § 25-6-304(2)(b).

And the last two arguments can be addressed together. The Howells argue that Gretchen can't be liable for Les's voidable transfers to obtain the Kingman property, because his investments went to contractors who took in good faith and for value. Both arguments flow from the premise that once the contractors took the voidable funds in good faith and for value, the fraudulent profits could no longer be voidable. First, they argue our analysis stops once the contractors take the funds; in other words, we shouldn't look to see if a party was transferred any value from the contractors' work. Second, they offer us an alternative argument: even if we consider any value transferred from the contractors' work—*i.e.*, the increase in the property's value that Gretchen enjoyed from that work—Gretchen is a transferee of the contractors, not Les. In

24

their view, because the contractors are good-faith transferees who took for

value, Gretchen can enjoy the fruits of their labor without any liability. We

doubt that the UVTA supports such a broad reading, but because the record

before us is so sparse on how and when Gretchen took an interest in the

Kingman property, we decline to wade into such a fact-bound discussion and

leave that for the district court on remand.

So here is where we stand in the analysis: Gretchen's interest in the

Kingman property is voidable because she is an immediate or mediate

transferee of Les who did not take for value. We next turn to the judgment. The

district court entered judgment against Les and Gretchen, stating that:

> Judgment is in the amount of $3,218,103.96. This judgment includes
> the funds that Leslie M. Howell received from the Receivership
> Defendants in excess of his principal investment and transferred to
> Gretchen A. Howell by titling their Kingman, Arizona property in
> her name as well as his own, which Gretchen A. Howell must
> disgorge.

App. vol. 6, at 1518. After judgment was entered, the Howells sought

clarification of the judgment under Federal Rule of Civil Procedure 59(e). They

wanted to know if the judgment against Gretchen was for her interest in the

property (which, they argued Gretchen could satisfy by transferring her interest

back to Les) or was instead a money judgment. If it was a money judgment,

they sought reconsideration of Gretchen's portion of the judgment, arguing that

25

there was insufficient evidence to support a $3,218,103.96 judgment against Gretchen.

The district court denied the Howells' motion but clarified that the judgment against Gretchen was a money judgment based on her joint interest in the Kingman property. *See Hafen*, 2023 WL 5000944, at *3, *5. The court clarified that Gretchen was not jointly liable for the $3,218,103.96 judgment; instead, she was liable for $1.5 million, half of Les's investment in the Kingman property. *Id.* at *4–5. The district court got to that number by relying on Les's testimony that he invested about $3–4 million in the property, taking the low-end of that range, and dividing it in half. *Id.* Consistent with that analysis, the court entered an amended judgment stating:

> Judgment is in the amount of $3,218,103.96; Gretchen Howell is liable for $1.5 million dollars of this total amount, and Leslie Howell is liable for the balance of this $3,218,103.96. In addition to this amount, Plaintiff Mr. Hafen is awarded $683,847.09 in prejudgment interest; Gretchen Howell is liable for a proportion of this amount of prejudgment interest that reflects her liability for $1.5 million dollars out of the total $3,218,103.96 judgment.

App. vol. 6, at 1575. The Howells argue the district court erred by awarding a $1.5 million judgment against Gretchen without sufficient evidence to support it.[10]

We review a district court's ruling on a Rule 59(e) motion for an abuse of discretion. *Nelson*, 921 F.3d at 929. A district court abuses its discretion when the court relies on an erroneous conclusion of law or a clearly erroneous factual finding. *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1119 (10th Cir. 2021). A finding of fact is clearly erroneous "if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *Id.* (internal quotation marks omitted).

We agree that the district court lacked sufficient evidence to support a $1.5 million judgment against Gretchen. That said, we see fewer errors in how the district court got to that dollar figure than the Howells do. Their first argument is the district court improperly relied on Les's deposition testimony that he spent $3–4 million on the property. In their view, that testimony is inadmissible because Les was speculating and lacked sufficient personal

---

[10] In their reply brief, the Howells argue that the district court erred by imposing a money judgment, citing a law-review article for the proposition that fraudulent transfer has historically been an in rem right of a creditor. But on the next page, the Howells concede the UVTA provides for a money judgment, so we treat that argument as abandoned.

knowledge to answer the question. When Les was deposed, he initially refused to give an estimate of how much money he spent on the property, but in response to a follow-up question of whether he spent "between three and four" million dollars, Les responded, "That would probably be a good estimate, yes." App. vol. 5, at 1172. Les's counsel did not object to the exchange.

We see no abuse of discretion in relying on that testimony. Les had personal knowledge to answer the question because he was the one who spent the money, so he was not speculating. Though he qualified his answer that it would "probably be a good estimate," that equivocation goes to the weight of the testimony. *Id.* So we find the district court properly relied on the testimony.

But we find the district court abused its discretion by relying *solely* on that testimony to conclude that Gretchen is liable for $1.5 million. The district court assumed that a $3 million investment in the property led to $3 million in value for the Kingman property, without any other evidence of the property's value on the date of transfer to Gretchen. We have rejected drawing such an inference. *See Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1201 (10th Cir. 2022) (reversing a judgment that included the cost of improvements to a property because the court had no evidence of the property's value on the date of transfer).

The UVTA provides that a creditor "may recover judgment for the value of the asset transferred," which must "be for an amount equal to the value of

28

the asset *at the time of the transfer*, subject to an adjustment as equities may require." § 25-6-304(2)(a), (3) (emphasis added). At oral argument before us, Hafen argued that the asset that Les transferred to Gretchen was the money invested in the property, not the value of Gretchen's interest in the home. In other words, if Les transferred his interest in the property to Gretchen after he invested $3 million in the property, Gretchen would be liable for $1.5 million *even if* the property by then was worth only $1 million. That argument belies the language of the statute. The asset Les transferred to Gretchen was an interest in the Kingman property, so judgment against her must equal the value of her interest in the Kingman property when it was transferred to her.[11] *Id.*

We find that Les's testimony that he probably spent $3–4 million on the property does not show the value of Gretchen's interest in the property. The record before us contains too many unknowns about how that money found its way to Gretchen and a more developed record will provide greater certainty. For example, our review of the record reveals that some of Les's distributions from Rust Rare Coin were put in an escrow account to which Gretchen was a beneficiary. App. vol. 4, at 927 (showing a $114,450.85 transfer from Rust

___

[11] Indeed, at oral argument Hafen argued that if Gaylen Rust paid for the renovations to the property himself, the Howells would be responsible for the amount spent, not the value of the property. Those are the precise facts of *Georgelas*, where we found there was insufficient evidence to hold one spouse liable for a judgment based only the value of the transfer. *Georgelas*, 45 F.4th at 1200–01.

Rare Coin to an escrow account on which Gretchen was a beneficiary), 930, 1044 (showing a similar $78,000 transfer). For all we know, every penny that went into the Kingman property came from this or another escrow account. If so, we'd have no need to assess the value of Gretchen's interest in the property because she would have had an interest in the money before it flowed into the property. As these facts are developed on remand, Gretchen's liability may rise or fall, but there must be more evidence to support the amount of the judgment against her.

Because we find no factual support in the record that the value of the asset transferred to Gretchen was $1.5 million, we hold the district court erred in entering judgment against her for $1.5 million. We thus reverse and remand for further proceedings.

## CONCLUSION

For the reasons stated, we affirm in part and reverse in part. The case is remanded for further proceedings consistent with this opinion.