FILED
United States Court of Appeals
Tenth Circuit

May 28, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

ERNESTINA CRUZ, as personal
representative of the Estate of Gilbert
Valencia; G.R.V., a minor, through next
friend Marianna Wheeler,

     Plaintiffs - Appellants,

v.

CITY OF DEMING; LEE COOK
JORDAN; SERGIO QUEZADA;
CRISTOBAL PAZ; ADAM ARAGON;
ROBERT CHAVEZ; BENJAMIN
SANCHEZ; DAVID ACOSTA; ASHLEY
STANDRIDGE,

     Defendants - Appellees,

and

NEW MEXICO DEPARTMENT OF
PUBLIC SAFETY; LUNA COUNTY;
ARTURO BAEZA

     Defendants.

No. 24-2091

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 2:22-CV-00957-MIS-GJF)**
_____

Erlinda O. Johnson (Joel R. Meyers, Ahmad Assed, and Richard Moran, with her on the
briefs), Law Office of Erlinda O. Johnson, Albuquerque, New Mexico, for Plaintiff-
Appellants.

Alan J. Dahl (Blaine T. Mynatt with him on the brief), Mynatt Springer P.C., Las Cruces, New Mexico, for Defendants-Appellees.

_____

Before **TYMKOVICH**, **McHUGH**, and **CARSON**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

A motorist on Interstate 10 near Deming, New Mexico, called 911 and reported that there was a man in the median with a firearm who may have fired shots. Soon after, responding police officers encountered Gilbert Valencia in a mesquite field near the highway. Valencia matched the description of the man in the report and was holding what appeared to be an AR-style rifle.

The officers ordered Valencia not to touch his weapon, to get on his knees, and then to get on his stomach. Valencia, however, failed to consistently comply with the officers' commands and placed his hand on the weapon, shifting its position. This alerted the officers of safety concerns and led five officers to shoot Valencia in response. He died from his wounds.

Valencia's estate (the Estate) brought federal and state law claims against the City of Deming, several individual police officers, Luna County, and the New Mexico Department of Public Safety. The officers moved for summary judgment, asserting qualified immunity as to several of those claims. The district court granted summary judgment on those claims, and also dismissed the Estate's claims brought under the New Mexico Tort Claims Act.

2

We **AFFIRM**. We conclude the officers are entitled to qualified immunity because their use of lethal force was objectively reasonable based on the circumstances presented. As to the state law claims, we find the Estate fails to identify a dispute of material fact that precludes summary judgment.

## I.    Background

### A.    *Report and Identification of Valencia*

On February 3, 2021, a motorist driving on Interstate 10 near Deming, New Mexico called 911 to report a man, wearing a gray sweater and a hat, standing in the median "shooting" a "big gun" at westbound traffic. The motorist indicated she was unclear if the gun was real.

Officers from multiple law enforcement agencies, including the Deming Police Department and Luna County Sheriff's Office, responded to the report of an active shooter. An officer spotted Valencia, who matched the reported description, walking north of the highway. He observed Valencia carrying a weapon resembling an AR-15 rifle in front of him, pointing it to the ground. The officer shared Valencia's location over radio, indicating that Valencia had "an AR."

A short time later, a group of law enforcement officers on foot encountered Valencia in a mesquite field, located north of Interstate 10; some of the officers recognized Valencia from previous encounters. Several officers were aware Valencia had a history of mental illness, and that he could be unpredictable and violent. They were also aware he sometimes carried weapons such as pellet guns and BB guns. The officers testified that they believed Valencia was the suspect described by the central dispatch and

that he was carrying a real firearm.  One of the officers testified Valencia informed him that "he had been 'out shooting rabbits,' which confirmed [his suspicion] that he was carrying a firearm."  App. Vol. I, 174.

### B.    The Fatal Shooting

Approaching Valencia, multiple officers shouted commands and more than one officer told him to put his hands up.  Valencia momentarily put his hands up, but then brought his hands back down and crossed his arms in front of his chest.  The officers again ordered Valencia to put his hands up and drop to his knees, and he complied.  After getting to his knees, Valencia touched the gun hanging from a shoulder strap at his left side with his left hand and moved the gun so that it was positioned in front of his stomach.  The officers shouted to not reach for the gun and to let go, and Valencia again put his hands above his head.  Officers commanded Valencia to keep his hands up and get on his stomach.  Instead of complying, Valencia reached for his pocket and withdrew what appeared to be a wallet and flashed it at the officers as if it were a badge, and then placed it back in his pocket.

At this point, Valencia was on his knees with his hands free and his weapon on the ground in front of him, slightly off to the side.  The officers continued to command Valencia to get on his stomach.  Valencia then looked down, leaned forward slightly, placed his left hand on the weapon near the barrel, and used his left hand to lift the weapon off the ground and raise it towards his body.  He then placed his right hand on the weapon closer towards the grip and removed his left hand from the barrel.  This motion caused the barrel to rotate towards the officers, although it did not fully rotate so

that it was pointing at the officers. Valencia continued to lean forward, placing his left hand on the ground in front of him. As the barrel rotated towards the officers, however, several of them feared for their safety and for the safety of the officers around them, and shot Valencia in response.

The entire encounter at the mesquite field lasted at least 44 seconds and was captured by at least two body-worn cameras. A total of 20 shots were fired by five officers, and Valencia was hit approximately 10 times. Valencia died from the gunshot wounds.

It was later determined that Valencia was carrying an airsoft gun with an orange tip that had been painted black. The weapon had several features indicating it was not an operable firearm, such as residual orange paint on the muzzle, a missing handguard on the forward section of the barrel, an empty magazine well, and no stock or buffer tube attached to the rear of the gun. An investigation by the state police located casings from the officers at distances ranging approximately 31 to 41 feet from where Valencia collapsed.

### C.    *Procedural Background*

The Estate's suit began in state court with state law claims against the Deming Police Department, individual officers, Luna County, and the New Mexico Department of Public Safety. Defendants moved to dismiss the Deming Police Department under the theory that it is not subject to suit as a municipal or county department or subdivision. Before the state court could rule on that motion, the Estate filed an amended complaint dismissing the Deming Police Department and adding City of Deming as a defendant.

The amended complaint also added federal claims along with its previously alleged state law claims. Defendants removed the case to the district court based on federal question jurisdiction.

The City of Deming and the officers moved for summary judgment on all of the Estate's claims.[1] Finding no disputed material facts based on deposition testimony, other record evidence, or bodycam footage, the district court granted summary judgment.

The Estate appeals the district court's decision dismissing their claims under the New Mexico Tort Claims Act (Counts I–III), and their excessive force claim under the Fourth Amendment (Count VI) against the officers.[2] The Estate argues the district court erred in granting summary judgment because: (1) evidence was improperly weighed,

---

[1] To be clear, the City of Deming and the officers filed two separate summary judgment motions. The first motion sought summary judgment based on qualified immunity for Counts I, II, III, and VI. The second motion sought summary judgment as to the remaining counts.

[2] On appeal, the Estate filed an opposed motion for judicial notice of state court records and to include those records in a supplemental appendix. In its reply brief, the Estate cites portions of Defendants' motion and reply filed in state court to support their assertion that Defendants violate the doctrine of judicial estoppel. The Estate's argument fails. To begin, and as the Estate concedes in its motion, Aplt. Mot. ¶ 5, this argument was available and could have been raised in the district court but was not asserted until the Estate's reply brief on appeal. *See United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) ("[W]e generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived." (citation omitted)). Importantly, we see no such violation here. Defendants argued in state court that the Deming Police Department should be dismissed as an entity because it cannot be sued *generally*. And as we explain *infra* Section II.B, Defendants later argued in federal court that the City of Deming cannot be sued under the New Mexico Tort Claims Act because the statute only applies to law enforcement officers. Those positions are not inconsistent and do not violate the doctrine of judicial estoppel. We therefore deny the Estate's motion and proceed with the current record in deciding this appeal.

(2) the declarations of the officers were erroneously credited over the Estate's experts, and (3) inferences from the video footage were not resolved in the Estate's favor. In short, the Estate argues there are numerous genuine material facts that preclude summary judgment.

## II.    Discussion

We first consider whether the district court erred in dismissing the Estate's excessive force claim and granting qualified immunity for the officers. We then consider whether the district court erred in dismissing the Estate's claims under the New Mexico Tort Claims Act.

### A.    Excessive Force Claim

The Estate argues the district court accepted the officers' version of events and failed to view evidence in the light most favorable to the nonmovant party. They assert the officers used objectively unreasonable force under the totality of circumstances.

#### 1.    Standard of Review

"This court reviews a grant of summary judgment on qualified immunity grounds de novo, applying the same standard as the district court." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (citation omitted). "Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(a)). "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

7

"The weighing of evidence, the reconciliation of inconsistent testimony, and the assessment of a witness' credibility is solely within the province of the jury." *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1297 (10th Cir. 2001). At the same time, "[w]e do not have to accept versions of the facts contradicted by objective evidence, such as video surveillance footage." *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1261 (10th Cir. 2022) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Bond v. City of Tahlequah, Oklahoma*, 981 F.3d 808, 813 n.7 (10th Cir. 2020) ("Because this is an appeal from a grant of summary judgment, we describe the facts viewing the video in the light most favorable to the Estate, as the nonmoving party." (citing *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020))), *cert. granted, judgment rev'd on other grounds*, 595 U.S. 9 (2021).

### 2.  *Legal Framework*

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The parties agree it was clearly established that force is unreasonable if an officer's reckless and deliberate conduct is the immediate cause of the need to use lethal force on a suspect.[3] Our focus then is whether the officers violated Valencia's constitutional right.

---

[3] *See Est. of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019) ("[A]n officer violates the Fourth Amendment when his or her reckless or deliberate conduct results in the need for lethal force . . . .").

In considering whether a constitutional right was violated, we treat excessive force claims as "seizure[s] subject to the reasonableness requirement of the Fourth Amendment." *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023); *see also Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). To establish a constitutional violation, the plaintiff must demonstrate the officers' actions were objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Palacios*, 61 F.4th at 1256 (quoting *Graham*, 490 U.S. at 397). The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Est. of Larsen*, 511 F.3d at 1259 (quoting *Graham*, 490 U.S. at 396).

We assess objective reasonableness based on "whether the totality of the circumstances justified the use of force," and "pay careful attention to the facts and circumstances of the particular case." *Id.* at 1260 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) ("The ultimate question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." (cleaned up)). "Deadly force is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Est. of Larsen*, 511 F.3d at 1260 (citation omitted).

9

In determining whether a use of force is reasonable, we consider: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Flores v. Henderson*, 101 F.4th 1185, 1194 (10th Cir. 2024) (citing *Graham*, 490 U.S. at 396).

### 3.    *Consideration of the* Graham *Factors*

With that background, we consider whether the officers' use of force was objectively unreasonable based on the totality of the circumstances under the *Graham* factors. In so doing, we review inferences in the Estate's favor and assess whether there are genuine disputes as to material fact that must be resolved by a jury. Because we find "[the Estate] cannot overcome the presumption of immunity as to the first prong"—that the officers violated Valencia's constitutional right—we find the officers entitled to qualified immunity. *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 758 (10th Cir. 2021) (citation omitted). The Estate's excessive force claim therefore fails.

### a.    **Graham** *Factor 1: Severity of Crime at Issue*

"[T]he first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) (citations omitted).

We agree with the district court that this factor weighs in favor of the officers. Here, the officers were made aware that an individual in a gray sweater and hat—a description that matched Valencia—was seemingly shooting a gun in the middle of the highway. Such an offense would be a crime of aggravated assault with a deadly weapon,

10

which is a violent felony in New Mexico. *See* N.M. Stat. Ann. § 30-3-2 ("Aggravated assault"); N.M. Stat. Ann. § 30-3-8 ("Shooting at dwelling or occupied building; shooting at or from a motor vehicle"). Few crimes are more serious than an active shooter on an Interstate highway. Even assuming the officers were made aware that Valencia had not yet fired shots, the crime at issue does not become any less severe because the officers would have reasonably believed Valencia could, at any time, choose to fire shots.

### b.     *Graham Factor 2: Immediate Threat to Safety*

The second *Graham* factor is considered the most important and fact-intensive factor. In assessing the degree of threat facing officers, we consider several nonexclusive factors. These include: (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect. *Est. of Larsen*, 511 F.3d at 1260. We consider each in turn.

### i.     *Compliance with Orders*

This factor favors the officers. Valencia's encounter with the officers, during which Valencia failed to fully comply with orders, was approximately 44 seconds. While Valencia complied with some orders after repeated commands, such as to raise his hands or get on his knees, he did not immediately comply or continue to comply with others. For example, the officers commanded Valencia to keep his hands up or show his hands and to not touch his gun. Valencia, however, touched his weapon, lowered his hands, and grabbed and flashed his wallet.

The Estate argues that multiple different commands were ordered by the officers, which confused Valencia. Bodycam videos demonstrate, however, that the commands were not contradictory to the point where it would have confused Valencia. Indeed, the videos show multiple officers ordered Valencia to "get on your stomach bro" or "get on the . . . ground" or "get on your stomach now." As recently held by this Circuit, an order to "raise his hands" does not conflict with an order to "get on the ground." *Alcala v. Ortega*, 128 F.4th 1298, 1308 & n.8 (10th Cir. 2025) (affirming qualified immunity for an officer because he reasonably but fatally shot the defendant when the latter "disobeyed [commands] for a full six seconds before making his sudden threatening movement" as if drawing a gun).

Nor do we find persuasive that Valencia's mental health conditions were not properly considered. We recently held the argument that an officer "should have realized" a plaintiff could have been "dazed, injured, mentally unwell, or otherwise impaired" is unconvincing because "that possibility takes a back seat to the [officers'] legitimate fear that [they were] about to be shot." *Id.*

### ii.    *Hostile Motions with a Weapon*

The parties disagree most as to this *Larsen* factor. The Estate argues Valencia was complying with the officers' orders to get on his stomach and was thus shifting his toy gun to his side before leaning forward. They argue a reasonable officer would have understood this play of events to not be hostile. On the other hand, the officers contend Valencia disobeyed their orders and touched or grabbed his weapon multiple times, making objectively hostile motions. Ultimately, we find this factor favors the officers.

12

Two recent Tenth Circuit cases are informative. In *Estate of Taylor v. Salt Lake City*, 16 F.4th 744 (10th Cir. 2021), we held officers acted reasonably in using lethal force on a suspect who had been noncompliant with their commands. There, officers were told by dispatch that a man had flashed a gun; the officers then identified a suspect who matched the description provided by the dispatch. Despite orders to stop and show his hands, the suspect walked away and was noncompliant with the officers' orders. The suspect's hands were concealed in front of his waistband and appeared to be "digging there" as if manipulating something. When the suspect suddenly, without verbal warning, lifted his shirt and "virtually simultaneously withdrew his right hand from his waistband" as if drawing a gun, we recognized that the officer only had a split-second to evaluate the situation. *Id.* at 747, 767. Under such circumstances, we found the use of lethal force was reasonable, even though the individual was later found to be unarmed. *Id.* And in *Palacios v. Fortuna*, 61 F.4th 1248 (10th Cir. 2023), we held that officers acted reasonably in firing at a suspect who had picked up his gun for the third time, despite commands not to do so. We made this determination even though the suspect had not fired his weapon, given that the suspect kept the gun on his waistband against warnings to drop the weapon, and the fact that he was "suspected of having just used it to threaten at least two people." *Id.* at 1259.

We can extrapolate from the two cases that "a reasonable officer would see a suspect who just picked up his gun and brought it in front of him, ignoring officer commands, as making a hostile motion." *Id.* at 1260. "[S]imply because a suspect has not yet fired a weapon does not mean that he will not do so in the future, particularly

when intentionally keeping his gun with him." *Id.* at 1259 ("[A] reasonable officer would not consider that [the suspect] was going to discard his weapon, given that he picked it up three times."). Moreover, an officer's actions can still be objectively reasonable even if a suspect turns out to be unarmed because an officer can act reasonably even with a mistaken view of the facts. *Id.* at 1260 (citing *Est. of Taylor*, 16 F.4th at 765–76). And if "an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Est. of Larsen*, 511 F.3d at 1260 (citation omitted) (finding a reasonable officer need not await the "glint of steel" before taking self-protective action; by then, it is "often . . . too late to take safety precautions." (citation omitted)); *see also Alcala*, 128 F.4th at 1308–09 (finding an officer to have made a reasonable, split-second decision when he fatally shot a suspect because the latter made sudden movements *as if* he were going to pull out a gun, even though he was not visibly carrying a firearm).

Here, based on the totality of circumstances, we consider that: (1) the officers mistakenly believed Valencia had a real firearm; (2) some of the officers were aware Valencia was mentally unstable and could be unpredictable or violent,[4] although he had not been violent towards officers in the past; (3) some of the officers were aware Valencia sometimes carried pellet guns or BB guns; (4) Valencia did not consistently

---

[4] While "[t]he mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation . . . . officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable." *Est. of Ceballos*, 919 F.3d at 1214 (citations and internal quotations omitted).

14

comply with the officers' orders and touched or moved his firearm more than once, against the officers' commands; and (5) Valencia lifted his weapon and shifted its position slightly towards the officers. Construing inferences in Valencia's favor, we assume the officers knew Valencia did not open fire at traffic. At the same time, we consider the testimony of the officers, which indicate that they thought Valencia's final movement was dangerous and threatened the safety of those at the scene. We find these factors support that the officers were reasonable in believing Valencia was making hostile motions with his weapon.

### iii.       *Distance between Officers and Valencia*

The parties agree the exact distance between the officers and Valencia is unknown at the time Valencia was shot, and thus the district court did not weigh this factor. The district court held, however, that the lack of cover in the mesquite field would likely weigh in favor of the officers. We agree that this factor slightly favors the officers.

Based on the alleged short distance between Valencia and the officers, the Estate argues the officers had the opportunity to observe Valencia possessed only a *toy* rifle, especially given some officers recognized Valencia and knew he had a history of mental illness. But as we explain in further detail below, it is reasonable that the officers would not have been able to carefully assess whether Valencia had a toy rifle in a high-pressure situation, particularly based on the other circumstances at play.

> ### iv.        Officers' Assessment of Valencia's Manifest Intentions

For the last factor, we consider "how a reasonable officer on the scene would have assessed the manifest indicators of [Valencia's] intentions." *Est. of Taylor*, 16 F.4th at 770. It is not what Valencia "subjectively intended[,] be it with his hand movements or otherwise." *Id.* (cleaned up).

For many of the same reasons discussed, we find this factor favors the officers—a reasonable officer in the same position would conclude Valencia made hostile gestures and manifested hostile intent. The officers had received a report that an individual suspected to be Valencia was in the middle of the highway with a firearm. Even if we assume the officers were made aware that Valencia had not fired any shots, some officers recognized Valencia as a mentally unstable individual known to be unpredictable and potentially violent. And Valencia did not consistently comply with the officers' commands to not touch his weapon and to keep his hands up; and his final motion was shifting his weapon slightly towards the officers.

The Estate argues Valencia was shot while attempting to comply with the order to get on his stomach by moving his gun out of the way. Indeed, analyzing the video by still frame, it is plausible to infer in the Estate's favor that Valencia was attempting to comply with the command to get on his stomach, and in the process, tried to move the weapon. Yet, Valencia's subjective intent is not the relevant inquiry. Instead, "[t]he reasonableness of a particular use of force must be 'judged from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* at

759 (quoting *Bond*, 981 F.3d at 821).

Moreover, this Circuit has held that "police officers are often forced to make split-

second judgments[5]—in circumstances that are tense, uncertain, and rapidly evolving—

about the amount of force that is necessary in a particular situation," and thus "the

reasonableness of the officer's belief as to the appropriate level of force should be judged

from that on-scene perspective." *Est. of Larsen,* 511 F.3d at 1259–60 (citation omitted

and cleaned up).  And because officers must make "split-second decision[s]," the

"Constitution permits officers to make reasonable mistakes" as they "cannot be mind

readers and must resolve ambiguities immediately." *Est. of Valverde ex rel. Padilla v.*

*Dodge*, 967 F.3d 1049, 1062 (10th Cir. 2020) (citation omitted).  So even though

Valencia may have *subjectively* intended to move his gun, a reasonable officer on the

scene would have assessed the situation as dangerous and threatening to himself and

others. *See id.* ("Perhaps a suspect is just pulling out a weapon to discard it rather than to

fire it.  But waiting to find out what the suspect planned to do with the weapon could be

suicidal.").

Still, the Estate argues the district court ignored the declaration of Officer Acosta,

who testified that he did not shoot Valencia because he did not feel threatened.  They

assert Officer Acosta's testimony suggests the officers' lethal force was objectively

unreasonable.  But "the failure of the other officers to fire is of little relevance." *Id.* at

---

[5] "Qualified immunity protects these types of split-second decisions, as long as the decisions are reasonable." *Alcala*, 128 F.4th at 1310 (citation omitted).

1065 (citation omitted). To add, Officer Acosta's declaration does not specify where he was standing at the scene and thus does not give us information as to whether his perspective of the situation was in fact identical to the other officers. *See Est. of Taylor*, 16 F.4th at 769 (noting the officer who did not shoot had less direct information because he was not positioned in front of the suspect, unlike the officer who fired shots and was in immediate danger).

Finally, to the extent the Estate contends the district court's factual determination is contradicted by their experts, that argument fails. The Estate relies on the declaration of an expert in police use of force and procedure; the expert found a "close review of the lapel camera video footage showed that at no point did [Valencia's] toy rifle appear to be pointed at officers or in their direction." Aplt. Br. 11. The declaration provides that "based on a careful review of the video footage," the "shooting officers' impressions of [Valencia's] body positions and movements were incorrect and did not happen as described by the officers in order to justify their deployment of deadly force." *Id.* But as we stated, the declaration improperly considers the facts based on an expert's 20/20 hindsight viewed through bodycam videos, and is not responsive to our inquiry as to what a *reasonable officer* in the officers' situation would have seen or believed. *See Est. of Larsen*, 511 F.3d at 1259; *Est. of Taylor*, 16 F.4th at 759.

The Estate also relies on the findings of an expert in shooting incident reconstruction; the expert opined that the "majority of Mr. Valencia's gunshot wound paths are consistent with shots fired into his body immediately after his body had fallen and came to rest in a supine position." Aplt. Br. 22. In so arguing, the Estate cites *Estate*

18

*of Smart ex rel. Smart v. City of Wichita*, where we found an officer violated clearly

established law by shooting an individual "after it became clear he posed no threat." 951

F.3d 1161, 1175 (10th Cir. 2020) (denying qualified immunity for an officer who fired

"his final shots" after the unarmed suspect had surrendered on the ground and no longer

posed a threat, despite an opportunity to reassess the situation). They argue that the

gunshot wounds demonstrate Valencia was shot even after he did not pose a threat. But

the facts here are not like those in *Smart*. Based on the bodycam footage, the officers

fired shots at the same time for less than three seconds. And no further shots were fired

after the officers reassessed the situation.

### c.    Graham *Factor 3: Actively Resisting or Attempting to Evade Arrest*

Finally, the last *Graham* factor favors the Estate because there is no evidence that

Valencia was actively resisting or trying to evade arrest by fleeing. The officers'

arguments as to Valencia's lack of compliance with their orders and his repeated

touching of his weapon are arguments better suited and were adequately addressed under

the second *Graham* factor.

\*       \*       \*

In sum, it was objectively reasonable for the officers to use lethal force based on

the totality of circumstances of the full encounter, which a reasonable officer at the scene

would have perceived as dangerous and hostile. *See Est. of Taylor*, 16 F.4th at 765

("[T]he totality of the circumstances includes application of the *Graham* and *Estate of*

*Larsen* factors to the full encounter, from its inception through the moment the officers

19

employed force." (quoting *Bond*, 981 F.3d at 818)). There is no genuine dispute as to the material facts—the bodycam videos demonstrate the officers' commands were not contradictory, and Valencia did not consistently comply with the officers' orders to not touch his weapon. Whether Valencia subjectively intended to move his gun is irrelevant under the *Graham* factors and does not create material disputed facts that preclude summary judgment.

Accordingly, the officers are entitled to qualified immunity on the Estate's excessive force claim.

### B.    New Mexico Tort Claims Act

The Estate also pursues several claims under the New Mexico Tort Claims Act: (1) Assault and Battery Resulting in Wrongful Death (Count I); (2) Negligence Resulting in Assault and Battery and Wrongful Death (Count II); and (3) Negligent Training, Supervision, and Retention (Count III).[6] They assert the district court erred in dismissing its state law claims. We consider each argument below.

#### 1.    Count I: Assault and Battery Resulting in Wrongful Death

The Estate argues the district court erred in finding the officers' use of force was objectively and subjectively reasonable. They primarily contend the subjective reasonableness analysis should have been deferred to a jury.

---

[6] The Estate brought Count I against the officers and the City of Deming; Count II against all Defendants; and Count III against the City of Deming, Luna County, and the New Mexico Department of Public Safety.

New Mexico Statute "Section 41-4-12 waives immunity for law enforcement officers where their actions result in liability for the enumerated torts of assault and battery." *Hernandez v. Parker*, 508 P.3d 947, 956 (N.M. Ct. App. 2022) (citation omitted). "The current iteration of a 'general rule,' or privilege, for law enforcement officers to use force" derives from the American Jurisprudence on assault and battery. *Id.* at 958. In short, "[p]olice officers may not be held liable in an action for assault and battery for the use of reasonably necessary force in the enforcement of the law. Officers are privileged to use force or commit battery when making a lawful arrest." *Id.* (quoting 6 AM. JUR. 2D, *Assault & Battery* § 104 (2021)); *see also Reynaga v. Cnty. of Bernalillo*, 64 F.3d 670, *2 (10th Cir. 1995) (unpublished table decision) ("If more than necessary force is used, then the officer commits an unprivileged assault on the arrested person." (quoting *State v. Kraul*, 563 P.2d 108, 112 (N.M. Ct. App. 1977))).

Unlike the Fourth Amendment analysis, the immunity analysis under the New Mexico Tort Claims Act includes both an objective and a subjective test. *Hernandez*, 508 P.3d at 958. ("The Fourth Amendment is famously a strictly objective test."). An officer "must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Id.* (quoting 6 AM. JUR. 2D, *Assault & Battery* § 104). Importantly, the defendant bears the burden to establish the defense or privilege. *Id.* at 959 ("[T]he federal and state causes of action allocate the burden of proof differently. . . . The federal qualified immunity analysis shifts the entire burden of proof to the plaintiff." (citation omitted)).

Having already discussed objective reasonableness, we focus on the Estate's arguments as to the officers' subjective reasonableness. As the Estate argues, "New Mexico courts . . . prefer reasonableness questions to be decided by a jury." *Id.* (citation omitted) ("[I]n state court, the question of reasonableness is generally reserved for the jury, while the federal court decides the constitutional 'reasonableness' question as a matter of law in the excessive force context."). But that is only if there is a dispute as to material facts.

Here, the Estate does not identify any evidence in the record demonstrating the officers had ill intent or the officers subjectively believed they used more force than necessary. Rather, the officers' declarations show that they believed Valencia posed a danger and that they feared for their own safety as well as the safety of those around them. The Estate relies on expert testimony based on bodycam footage; but such evidence is unpersuasive here because, as we noted, an officer's judgment must be compared to "that of a *hypothetical reasonable police officer placed in the same situation*," not based on a third party's hindsight analysis. *See id.* at 957 (emphasis added) (quoting 6 AM. JUR. 2D, *Assault & Battery* § 104).

In the absence of countervailing evidence suggesting the district court overlooked material facts, there is simply no reason to continue litigation. *See Martinez v. N.M. Dep't of Transp.*, 296 P.3d 468, 477 (N.M. Sup. Ct. 2013) ("Questions of 'reasonableness' are quintessential issues for a jury to resolve" when there are "conflicting affidavits" and "reasonable minds could differ" as to the relevant interpretation); *c.f. Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir.

1994) ("Although summary judgment is not ordinarily appropriate for settling issues of intent or motivation, . . . all of [plaintiff's] evidence together is insufficient to raise doubts about the [defendant's] motivation." (internal citations omitted)).  Accordingly, we hold the officers are not liable for assault or battery because their lethal force was reasonably necessary and thus privileged.

As for the Estate's assault and battery claim against City of Deming, § 41-4-12 does not apply.  Again, "Section 41-4-12 waives immunity for *law enforcement officers* where their actions result in liability for the enumerated torts of assault and battery." *Hernandez*, 508 P.3d at 956 (emphasis added) (citation omitted).  The statute defines law enforcement officer as:

> a full-time salaried public *employee* of a governmental entity, or a certified part-time salaried police *officer* employed by a governmental entity, whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor.

N.M. Stat. Ann. § 41-4-3 (1978) (emphases added).  An entity, such as the City of Deming, is not an employee or officer within the meaning of the statute.

We thus affirm the district court's dismissal of Count I against the officers and the City of Deming.

### 2.     *Count II: Negligence Resulting in Assault and Battery and Wrongful Death*

The Estate's brief concedes that "Count II cannot survive independent of Count I." Aplt. Br. 52.  Having found that the officers did not commit an assault or battery because

their force was privileged, we find that Count II necessarily fails because negligence cannot arise when no underlying assault or battery exists. And as we explained, the relevant New Mexico statute does not apply to entities like the City of Deming, Luna County, and the New Mexico Department of Public Safety because they are not employees or officers within the meaning of the statute. We therefore affirm the district court's dismissal of Count II.

### 3.    Count III: Negligent Training, Supervision, and Retention

The Estate's final state law claim is against Defendants City of Deming, Luna County, and the New Mexico Department of Public Safety.[7] Again, the relevant New Mexico statute waives immunity only for law enforcement officers, not such entities.

Additionally, New Mexico state courts have held that immunity does not extend to "supervisory law enforcement officers who negligently train or supervise subordinates." *Caillouette v. Hercules, Inc.*, 827 P.2d 1306, 1311 (N.M. Ct. App. 1992) (citations omitted). Instead, "the negligence complained of must cause a specified tort or violation of rights; immunity is not waived for negligence standing alone." *Id.* Having found there is no underlying assault or battery, Count III fails.

We therefore affirm the district court's dismissal of Count III.

---

[7] The New Mexico Department of Public Safety's motion for partial summary judgment as to Count III was granted by the district court on November 2, 2023. Luna County's motion for summary judgment and qualified immunity for claims including Count III was denied as moot as part of the district court's underlying decision.

## III.  Conclusion

For the foregoing reasons, we affirm the district court's summary judgment of the Estate's excessive force claim and New Mexico State Tort Act claims.