**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

JOSEPH Z. WOMBLE,

    Plaintiff - Appellant,

v.

JERRY CHRISMAN; TOMMY SHARP,

    Defendants - Appellees.

_____

JOSEPH Z. WOMBLE,

    Plaintiff - Appellant,

v.

JERRY CHRISMAN; TOMMY SHARP,

    Defendants - Appellees.

-----------------------

PUBLIC JUSTICE,

    Amicus Curiae.

No. 24-7061

No. 25-7028

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:14-CV-00385-JAR)**
_____

Sean S. Cuff, Brownstein Hyatt Farber Schreck, LLP, Denver, Colorado (Neil S. Sandhu, Brownstein Hyatt Farber Schreck, LLP, Denver, Colorado, and Julian R. Ellis, Jr., First & Fourteenth PLLC, Colorado Springs, Colorado, with him on the briefs) appearing for Appellant.

Erin M. Moore, Assistant Attorney General (Stefanie E. Lawson and Evan J. Edler, Assistant Attorneys General, on the brief), Office of the Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellees.

_____

Before **HARTZ**, **MATHESON**, and **McHUGH**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Joseph Womble, currently an Oklahoma state prisoner, was incarcerated at the Mack Alford Correctional Center (MACC) in Stringtown, Oklahoma, from January 2012 to August 2016. He filed this 42 U.S.C. § 1983 action claiming Eighth Amendment conditions-of-confinement violations at MACC. He alleged that, following a sudden influx of inmates into MACC in May 2014, MACC Warden Jerry Chrisman and Deputy Warden Tommy Sharp (collectively, "Defendants") knowingly subjected him to (1) inadequate nutrition and (2) unsanitary and unsafe toilet and shower facilities. The district court granted summary judgment to the Defendants on both claims and awarded them costs under 28 U.S.C. § 1920.

Mr. Womble filed two appeals. In Appeal No. 24-7061, he challenges the summary judgment ruling, which we affirm on the nutrition claim and reverse on the facilities claim. In Appeal No. 25-7028, he challenges the cost award, which we vacate and remand. We exercise jurisdiction over both appeals under 28 U.S.C. § 1291.

## I.    BACKGROUND

### A. *Factual History*[1]

### 1. **MACC and the A-South Unit**

MACC is a medium security correctional facility operated by the Oklahoma Department of Corrections (ODC).  Mr. Chrisman was the MACC warden from September 24, 2012 to June 1, 2015.  Mr. Sharp was the deputy warden from September 2012 to February 1, 2015.

MACC consists of A, B, and C housing units.  The A unit contains the A-North and A-South pods.  A-South includes 50 cells and several common areas, including a day room, a TV room, and a library.  Each A-South cell has two bunks and one toilet.

Mr. Womble was housed at MACC from January 2012 to August 2016.  He was assigned to the A-South unit from May 1, 2014 to February 23, 2016.

On May 1, 2014, MACC received 128 inmates from Oklahoma county jails, which increased the A-South inmate population from 100 to 132 inmates.  Because there were not enough regular cells in A-South to accommodate the new inmates, MACC constructed 32 temporary bunks in the common areas.

---

[1] On appeal from summary judgment, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party."  *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quotations omitted).  We present this factual history accordingly. *See Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1284 (10th Cir. 2022).

a.  *Food service issues at MACC*

MACC served inmates food on plastic trays that contained an eight-ounce slot in the bottom middle, a four-ounce slot on the bottom left, and three two-ounce slots on the top.  Before the influx of new inmates in May 2014, each slot contained food.  But when the new inmates arrived, the MACC food service department began withholding food from one or more of the two-ounce slots, which inmates called "blanking the slots," resulting in Mr. Womble's receiving fewer calories per day.  App., Vol. 4 at 942, 949, 955, 979, 1039.[2]

Although inmates could use personal funds to buy additional food items from the canteen, Mr. Womble had limited funds and purchased food from the canteen on only four occasions between May 2014 and September 2015.

Mr. Womble said he "observed flies, cockroaches, and rodents in [MACC's] kitchen," and that these insects and rodents "contaminated the food."  *Id.* at 980.  He also said he "was served spoiled and contaminated meat, fruit, and milk on a regular basis after May 2014."  *Id.*  At times the food was "too heavily processed for [Mr. Womble's] stomach to handle it," and he "skipped out" on those meals.  *Id.* at 901.  Mr. Womble further said that MACC's kitchen staff would leave frozen

---

[2] Food Service Daily Reports from MACC arguably confirm Mr. Womble's allegations.  These reports indicate that, during at least some of the time when Mr. Womble was housed in the A-South unit, unidentified "Substitutions" were made to meals due to "Fiscal/Budget Constraints."  App., Vol. 2 at 337-395.

4

chicken out to thaw overnight and that "on multiple occasions" it became "spoiled." *Id.* at 920.

Mr. Chrisman considered MACC "underfunded . . . [e]verywhere," including its food service department, and he and his staff were concerned about providing basic services, including food, to inmates at MACC. *Id.* at 822; *see id.* at 817. Despite those concerns, there is no evidence that Mr. Chrisman requested additional funding from DOC following the influx of new inmates.

At some point in 2014, Mr. Womble spoke with Mr. Sharp about the food rationing. He "asked [Mr. Sharp] about the food and told him [they] were starting to get less and less food portions." *Id.* at 923. Mr. Sharp allegedly replied, "'son, you should be grateful you get food.'" *Id.*

b. *Toilet and shower issues at the A-South Unit*

The temporary bunks in A-South did not have bathrooms, so MACC left two (and later three) cells vacant so that inmates housed in the temporary bunks could use the toilets in each of them. As a result, 32 inmates housed in the temporary bunks had to share the two (and later three) toilets. And all 132 inmates in A-South shared 11 showers.

Mr. Womble was assigned to a temporary bunk from May 1, 2014 to December 15, 2014, and again from June 23, 2015 to September 18, 2015.[3] From

---

[3] From October 16, 2014 through October 20, 2014, Mr. Womble was housed in a cell in MACC's special housing unit.

December 15, 2014 to June 23, 2015, and again from September 18, 2015 to February 11, 2016, he occupied an A-South regular cell.

Due to the overcrowding in A-South, the toilets and showers shared by inmates in the temporary bunks became overwhelmed. Toilets were often "out of order" or "overflowing." *Id.* at 981.[4] The bathrooms contained garbage and exposed wiring. Shower drains were frequently clogged. These conditions "were either not fixed or maintenance was delayed." *Id.*[5] The maintenance issues caused Mr. Womble and other inmates to be exposed to feces and urine in the bathrooms and showers.

Mr. Womble routinely wore his boots when he "went to the bathroom" due to "the general condition of the bathroom[s]." *Id.* at 918. Further, because the bathrooms often had lightbulbs out, using the bathroom at nighttime meant "hav[ing] to feel around" to locate the toilet and then, because the toilets were dirty, "hav[ing] to just kind of squat over the toilet to use the bathroom." *Id.* Mr. Womble would then use the mop closet to clean his boots off after using the toilet.

As inmate fights increased in the A-South temporary facilities, MACC staff placed problematic inmates in two of the three temporary cell-converted-bathrooms, which forced Mr. Womble and other inmates in the temporary bunks to use a single

---

[4] Mr. Womble alleged that, on occasion while he was housed in the temporary bunks on A-South, he "was served spoiled food" and had to vomit "with his face close to the overflowing toilet." App., Vol. 3 at 732-33.

[5] Mr. Womble said the A-South showers often were flooded and sometimes inoperable while maintenance tried to fix them.

bathroom. This arrangement occurred approximately five times during 2015, with each incident lasting around one week.

Mr. Womble soiled himself "multiple times waiting for a bathroom to open up." *Id.* at 982. He alleges he "experienced physical pain while waiting on bathrooms, and [his] digestive system suffered damage for having to hold bowel movements for long periods of time." *Id.* He also said that "on at least five different occasions in 2014 and 2015," he "experienced severe emotional damage in the form of embarrassment and anxiety due to soiling [him]self." *Id.*

B. *Procedural History*

In September 2014, Mr. Womble filed a pro se complaint under 42 U.S.C. § 1983 concerning the conditions of confinement at MACC. In November 2015, Mr. Womble filed an amended complaint narrowing his § 1983 claims to (1) inadequate nutrition, (2) failure to adequately screen new inmates for mental illness, and (3) inadequate maintenance of bathroom and shower facilities and resulting unhygienic conditions. The amended complaint named Mr. Chrisman, Mr. Sharp, and Donna Vitoski, the former food service manager at MACC, in their individual and official capacities.[6]

Mr. Chrisman and Mr. Sharp moved to dismiss the amended complaint for failure to state a claim, which the district court granted. On appeal, we concluded

---

[6] Mr. Womble voluntarily dismissed Ms. Vitoski. Dist. Ct. Docket Entry No. 66. He also dismissed his official capacity claims against Mr. Chrisman and Mr. Sharp. *See* Aplt. Br. at 18.

"the district court should not have dismissed Mr. Womble's food deprivation and failure to maintain sanitary facilities claims, but . . . properly dismissed his inadequate inmate screening claim." *Womble v. Chrisman*, 770 F. App'x 918, 921 (10th Cir. 2019) (unpublished) (*Womble I*). We said Mr. Womble "alleged a sufficiently serious deprivation to survive a motion to dismiss because the rationing [of food] lasted more than 16 months, he lost 21 pounds, and he suffered from stomach pain, digestive damage, and vomiting." *Id.* at 924. We also said Mr. Womble sufficiently alleged an inadequate-facilities claim. *Id.* at 925.

On remand, Defendants moved for summary judgment, in part arguing that Mr. Womble failed to exhaust his administrative remedies. *Womble v. Chrisman*, No. 21-7015, 2022 WL 334107, at *1 (10th Cir. Feb. 4, 2022) (unpublished) (*Womble II*). The district court agreed and granted summary judgment. On appeal, we reversed, concluding that MACC did not provide Mr. Womble with a usable grievance process, so there were no available administrative remedies to exhaust. *Id.* at *4.

On remand, the district court permitted Mr. Womble to obtain discovery on his claims. In January 2024, Defendants again moved for summary judgment.[7] They effectively conceded that the law applicable to Mr. Womble's claims was clearly

---

[7] Mr. Womble was represented by counsel in the district court summary judgment proceedings and is represented on this appeal.

established.[8]  But they argued that no constitutional violations occurred and that they were entitled to qualified immunity.  The court agreed that Mr. Womble had a clearly established right to (1) "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it," App., Vol. 6 at 1472 (quotations omitted), and (2) to "adequate and sanitary prison facilities," *id.* at 1465.  But it concluded that Mr. Womble failed to identify sufficient evidence to support his claims.  The court thus granted summary judgment for the Defendants on both claims.

Following the entry of final judgment, Defendants moved under Federal Rule of Civil Procedure 54 and 28 U.S.C. § 1920 for an award of $5,589.60 to cover their costs for certain deposition transcripts.  The district court granted the motion over Mr. Womble's opposition.  These appeals followed.

## II.  DISCUSSION

In Appeal No. 24-7061, Mr. Womble argues the district court erred by (A) excluding evidence that he submitted in opposition to the Defendants' motion for

---

[8] Defendants denied that the law was "clearly established that an eighth amendment violation occurs when food was 'occasionally' unpalatable or contaminated, or subjectively not enough to satiate a particular inmate or whether the Eighth amendment clearly established minimum operational toilet and shower ratios for inmates for sanitation purposes."  App., Vol. 1 at 137.  But they conceded that "[a]t the time these claims arose, it was clearly established that prison officials must provide adequate nutrition to maintain an inmate's health."  *Id.*  They also conceded it was clearly established that "[p]rison officials must provide safe, sanitary facilities" to inmates.  *Id.* at 138; *see also id.* at 132 ("The Eighth Amendment . . . requires states to provide inmates reasonably adequate sanitation and utilities such that an inmate's mental and physical wellbeing is not threatened.").

summary judgment and (B) granting summary judgment to Defendants on both of his § 1983 claims.  In Appeal No. 25-7028, Mr. Womble argues that (C) the district court erred in granting the Defendants' motion for costs.

## A. *Exclusion of Evidence*

Mr. Womble asserts that the district court abused its discretion and "stymied [his] ability to oppose summary judgment by excluding three pieces of evidence" he submitted in opposition to the Defendants' summary judgment motion, Aplt. Br. at 21—(1) a written expert report from Jane Reagan, a "Registered Dietitian Nutritionist," App., Vol. 4 at 1037, (2) a letter written by inmate Michael Yoder to Mr. Womble's attorney, and (3) portions of Mr. Womble's declaration.

Generally speaking, "[w]e review a district court's evidentiary determinations when resolving a motion for summary judgment—including the decision to treat submissions as competent evidence—for an abuse of discretion."  *Hafen v. Howell*, 121 F.4th 1191, 1201 (10th Cir. 2024) (quotations omitted).  "That includes the admission or exclusion of expert testimony."  *Id.*  "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment."  *United States v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018) (quotations omitted).

Here, however, we conclude it is unnecessary to decide whether the district court abused its discretion.  Having reviewed this evidence, we conclude it would not affect the outcome on either of Mr. Womble's § 1983 claims.  Even if we assume the district court erred in excluding this evidence and consider it as part of our de novo

review of the court's grant of summary judgment, it would not alter our conclusions on whether summary judgment should be granted on either claim.

## B. *Grant of Summary Judgment*

For the reasons outlined below, we conclude the district court properly granted summary judgment on the inadequate-nutrition claim but not on the inadequate-facilities claim.[9]

### 1. **Legal Background**

#### a. *Standard of review*

We review de novo a grant of summary judgment on qualified-immunity grounds, applying the same standard that governs the district court. *See Cruz v. City of Deming*, 138 F.4th 1257, 1265 (10th Cir. 2025). A court grants summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Cruz*, 138 F.4th at 1265 (quotations omitted).

When, as here, the defendant has moved for summary judgment based on qualified immunity, the plaintiff must show "a reasonable jury could find facts supporting a violation of a constitutional right." *Est. of Booker v. Gomez*, 745 F.3d

---

[9] Although we previously reversed the dismissal of Mr. Womble's claims based on the allegations in his first amended complaint, *Womble I*, 770 F. App'x at 921, at summary judgment we consider whether he has backed up his allegations with evidence.

405, 411 (10th Cir. 2014). "If a reasonable jury could return a verdict for the nonmoving party, summary judgment is inappropriate." *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015) (quotations omitted).

b. *Qualified Immunity*

"[Q]ualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted).

When a defendant asserts qualified immunity at the summary-judgment stage, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Cruz*, 138 F.4th at 1266 (quotations omitted).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (quotations omitted). "The law is clearly established when a Supreme Court or Tenth Circuit precedent is on point or the alleged right is clearly established from case law in other circuits." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017). The relevant "precedent is considered on point if it involves *materially similar conduct* or applies with *obvious clarity* to the conduct at issue." *Id.* (quotations omitted).

The district court in this case concluded, and Defendants do not dispute, that the law applicable to both of Mr. Womble's claims was clearly established at the time

12

of the alleged constitutional violations. Like the district court, we focus on whether

Mr. Womble presented sufficient evidence to allow a reasonable jury to find that

Defendants violated his constitutional rights. *See Paugh v. Uintah Cnty.*, 47 F.4th

1139, 1159 (10th Cir. 2022).

### c. *Eighth Amendment*

#### i. Conditions of confinement

Mr. Womble's conditions-of-confinement § 1983 claims allege violations of

the Eighth Amendment, which prohibits "cruel and unusual" punishment. *See*

U.S. const. amend. VIII. The Supreme Court has held "the unnecessary and wanton

infliction of pain" constitutes cruel and unusual punishment forbidden by the Eighth

Amendment. *Whitley v. Albers*, 475 U.S. 312, 320 (1986). "Among unnecessary and

wanton inflictions of pain are those that are totally without penological justification."

*Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quotations omitted).

Although "[t]he Constitution does not mandate comfortable prisons," it does

not "permit inhumane ones, and it is now settled that the treatment a prisoner

receives in prison and the conditions under which he is confined are subject to

scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832

(1994) (quotations and citations omitted). It thus "places restraints on prison

officials, who may not, for example, use excessive force against prisoners." *Id.* "The

Amendment also imposes duties on these officials, who must provide humane

conditions of confinement; prison officials must ensure that inmates receive adequate

13

food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* (quotations omitted).[10]

ii. Objective and subjective components

"An inmate making an Eighth Amendment claim for constitutionally inadequate conditions of confinement must allege and prove an objective component and subjective component associated with the deficiency" claimed. *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001).

"The objective component requires conditions sufficiently serious so as to 'deprive inmates of the minimal civilized measure of life's necessities,'" *id.* (quoting *Rhodes*, 452 U.S. at 347), or conditions "sufficiently serious so as [to] constitute a substantial risk of serious harm," *id.* (citing *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993)).

"The subjective component requires that a . . . prison official have a culpable state of mind, that he or she acts or fails to act with deliberate indifference to inmate health and safety." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 297, 303 (1991)). The prisoner must show the defendants "knew he faced a substantial risk of harm and disregarded that risk 'by failing to take reasonable measures to abate it.'" *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 847). Officials who are aware of the potential for harm and take "reasonable efforts to

---

[10] The Eighth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666 (1962).

14

avoid or alleviate that harm," bear no liability. *See DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001). This is so "even if the harm ultimately was not averted.'" *Howard v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008) (quoting *Farmer*, 511 U.S. at 844-45).

### iii. Nutrition and bathrooms

We have long held that the Eighth Amendment requires prison officials to provide inmates with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates." *Ramos v. Lamm*, 639 F.2d 559, 570-71 (10th Cir. 1980); *see also Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002) ("A prison must provide adequate food . . . to inmates, and the food must be nutritionally adequate" (citations and quotations omitted)). "A substantial deprivation of food may be sufficiently serious to state a conditions of confinement claim under the Eighth Amendment." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006) (quotations omitted).

We also have held that "the lack of access to working toilets" and any related "exposure to other inmates' urine and feces via . . . standing water" is sufficient to "state a successful conditions of confinement claim." *DeSpain*, 264 F.3d at 974.[11] "Exposure to human waste, like few other conditions of confinement, evokes both the

---

[11] In granting summary judgment to Defendants on the inadequate-facilities claim, the district court suggested that Mr. Womble was alleging a right to "receive unmitigated access to a toilet." App., Vol. 6 at 1465. We disagree. Mr. Womble has consistently alleged that Defendants failed to ensure there were adequate toilets to serve the inmates in A-South.

health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." *Id.*

In *McBride v. Deer*, 240 F.3d 1287 (10th Cir. 2001), we held "that conditions, such as a filthy cell [covered with feces], may be tolerable for a few days." *Id.* at 1291 (quotations omitted). But we also noted that "the length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases." *Id.* (quotations omitted). We concluded that an inmate who was confined for a "three-day period" in such a cell "demonstrate[d] a sufficiently serious condition of confinement." *Id.* at 1292.

We likewise concluded that the conditions alleged in *DeSpain* were sufficient to "meet the first prong of the *Farmer* test." 264 F.3d at 975. There, the plaintiff-inmate alleged "that the lack of access to working toilets led to his exposure to other inmates' urine and feces via the standing water and also to close confinement with the odor of his own accumulated urine." *Id.* at 974. We emphasized that "[e]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." *Id.*[12]

---

[12] *See Vinning-El v. Long*, 482 F.3d 923, 924-25 (7th Cir. 2007) (holding that inmate's six-day confinement in disciplinary-segregation cell that lacked a working toilet and that had walls "smeared with blood and feces" stated a viable Eighth Amendment violation); *Elder v. Bass*, 24-30653, 2025 WL 2219005, at *1-3 (5th Cir. Aug. 5, 2025) (holding that prisoner who was, due to water issues at detention center, forced to defecate into plastic bags and then deposit those bags into a larger bag filled with the excrement of approximately 80 other inmates stated a viable Eighth Amendment claim).

2. **Analysis**

a. *Inadequate-nutrition claim*

We agree with the district court that a reasonable jury would not find the objective or subjective components met on the inadequate-nutrition claim.[13]

i.   Objective component

In his deposition, Mr. Womble testified that between May 2014 and August 2016 (when he left MACC), "[u]sually about one to two meals a day would not be nutritionally adequate," meaning "[t]hey wouldn't have enough food on them." App., Vol. 1 at 210. He also testified that "the majority of the meals caused [him] to go hungry." *Id.* Similarly, in his declaration, Mr. Womble stated that "[i]n early June 2014, [he] noticed that the portion sizes, as compared to the tray slots, started shrinking" and "slots on the food trays started being skipped altogether." App., Vol. 4 at 979. He also declared that the Defendants' own food service records confirm that, due to "Fiscal/Budget Constraints," MACC made substitutions to the regular menu on a daily basis during the time period in question. *Id.* (quotations omitted).

The precise extent of food rationing and its impact on Mr. Womble's daily caloric intake is not clear. In his declaration, Mr. Womble provided "[a]n example of

---

[13] The district court excluded Mr. Yoder's letter and the portions of Mr. Womble's declaration that relied on that letter. The excluded information indicated that the Defendants directed MACC's food service department to reduce portion sizes. Our disposition of the inadequate-nutrition claim is the same whether or not this evidence is considered.

the daily food [he] and other inmates at MACC were served": "for breakfast, eight ounces of gravy, two one-ounce biscuits, and four ounce[s] of oatmeal; for lunch, one two-ounce roll and thin slices of bologna; and, for dinner, one four-ounce chicken patty and one two-ounce roll." *Id.* Although this "example" suggests that rationing occurred at all three meals, Mr. Womble testified in his deposition that the rationing occurred at only one or two meals per day, rather than at all meals. App., Vol. 1 at 210. Nutrition expert Reagan relied on Mr. Womble's "example" meals to estimate his average daily caloric intake. But we question the accuracy of that estimate given the conflict between Mr. Womble's "example" meals and his deposition testimony. Also, Mr. Womble testified that he "wasn't starving or anything," but rather "just didn't feel full" from the meals served at MACC. *Id.* at 246.

Record evidence indicates that Mr. Womble lost weight at certain times between May 2014 and August 2016. He stated in his declaration that he "continually lost weight due to the inadequate diet (including ten percent of [his] body weight at one point)." App., Vol. 4 at 979. But the record contradicts that statement. Mr. Womble's medical records confirm that between June 12, 2014, and June 27, 2014, Mr. Womble lost 12 pounds (from 210 to 198). But the medical records also show that between late June 2014 and mid-August 2015, Mr. Womble's weight fluctuated between 206 and 191 pounds, and that he experienced periods of both weight loss and weight gain, not continual loss as he stated in his declaration,

18

suggesting that he received sufficient calories at least during the periods of weight gain.

In her written report, Ms. Reagan opined that (1) Womble "need[ed] approximately 2,745 calories each day to maintain his original weight of 220 lbs"; App., Vol. 4 at 1038, (2) based upon Mr. Womble's three "example" meals, "[t]he food served to Mr. Womble contained approximately 1,158 calories per day"; (3) "Mr. Womble was consistently being served 1,587 calories less than he needed each day"; *id.* at 1039 (emphasis omitted); and (4) again based on the three "example" meals, Mr. "Womble was only getting 42% of the calories that his body needed to maintain his daily living activities," "only 59% of the calories his body needed to maintain 'basic physiological functioning,'" and "approximately 43.5 g of protein per day, which is 54% of his daily needs" based on his body weight of 220 pounds; *id.* (emphasis omitted).

These opinions are problematic for at least two reasons. First, Ms. Reagan's calculation of Mr. Womble's average daily calorie intake was based solely on the three "example" meals provided by Mr. Womble. As previously discussed, those "example" meals are inconsistent with Mr. Womble's testimony that MACC's food service rationed food once or twice per day rather than at all three meals. Thus, the record evidence shows that Mr. Womble's average daily calorie intake was likely higher than Ms. Reagan's estimate. Second, Mr. Womble was, by his own admission, overweight. His medical records confirm that, as of June 2014, he was 5'9" and 210 pounds. Ms. Reagan's calorie calculations and opinions were based on

19

Mr. Womble's maintaining a weight of 220 pounds. Mr. Womble offers no authority that would require Defendants to provide him with sufficient calories to maintain an excess weight.

Based on the foregoing, we conclude a reasonable jury could find that some food rationing occurred at MACC during the relevant time period in question. But we are not convinced the evidence could allow a finding that the food rationing was so severe as to deprive Mr. Womble of the minimal civilized measures of life's necessities or create a substantial risk of serious harm to him.

      ii. Subjective component

Even if Mr. Womble could establish a triable issue on the objective component, we are not persuaded his evidence is sufficient to create a genuine issue of material fact as to whether Defendants knew that the food rationing posed a substantial risk of harm to him or disregarded such a risk by failing to take reasonable measures to abate it. *Hunt*, 199 F.3d at 1224. As noted, Mr. Womble's weight fluctuations between June 2014 and the summer of 2015 fell within a relatively narrow range, and there is nothing in the record suggesting Defendants knew of those fluctuations.

More importantly, there is no evidence indicating that Mr. Womble suffered adverse health effects from the alleged food rationing, let alone evidence that Defendants were aware of and disregarded any such effects. *See Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (noting that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards

20

an excessive risk to inmate health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference" (quotations omitted)).

*     *     *     *

In sum, Mr. Womble falls short on the objective component because he has not

shown a substantial risk of serious harm from food rationing.  And on the subjective

component, he has shown the Defendants knew about food rationing, but not that

they knew it created a substantial risk of harm to him.  For these reasons, we

conclude the district court properly granted summary judgment in favor of

Defendants on Mr. Womble's inadequate-nutrition claim.[14]

   b. *Inadequate-facilities claim*

We reverse the district court's summary judgment ruling on the

inadequate-facilities claim.

   i.  <u>Objective component</u>

The summary judgment evidence was sufficient for a reasonable jury to find

the objective component of Mr. Womble's inadequate-facilities claim.  The influx of

---

[14] Mr. Womble said in his deposition and declaration that MACC's food service regularly served spoiled food, particularly meat.  He also said in his declaration that he observed flies, cockroaches, and rodents in MACC's kitchen, and that these insects and rodents contaminated the food.  But his testimony and declaration on both points are vague on how often these events actually occurred.  And although Mr. Womble testified that he would throw up after eating spoiled meat, he did not specify in his deposition or declaration how often this occurred.  Finally, there is no evidence that Defendants were aware of these events.  We therefore conclude this evidence is insufficient to establish an Eighth Amendment violation.

new inmates into A-South in May 2014 resulted in the assignment of 32 inmates to temporary bunks in common areas, forcing them to share two or three toilets. It also caused 132 inmates to share 11 showers.

Mr. Womble testified at his deposition and stated in his declaration as follows.[15]

Issues with the toilets began to arise in June 2014, including inmates breaking or removing lightbulbs from the toilet areas, "toilets clogging," and inmates staying in the toilet areas "for hours at a time . . . shooting dope or doing whatever." App., Vol. 4 at 916.

The toilet conditions deteriorated and, by September and October 2014, there were "maintenance problems all the time, toilets overflowing," inmates "staying in the bathrooms for hours," and inmates "fighting in the bathrooms," all of which resulted in "long waits for the bathrooms." *Id.* At some point, MACC personnel began using the bathrooms as holding cells for inmates who got into fights and were awaiting transfer to MACC's special housing unit. When this occurred, only one or two bathrooms were left for the 32 inmates assigned to temporary bunks, resulting in one bathroom for either 16 or 32 inmates. And when an inmate locked himself in one of the bathrooms, it meant that the other inmates would sometimes have to wait hours to use a toilet.

---

[15] The district court did not exclude the portions of Mr. Womble's declaration based on personal knowledge concerning the inadequate-facilities claim.

Mr. Womble soiled himself approximately four or five times due to having to wait in long lines to use a bathroom. When this occurred, other inmates in line made fun of him. He "felt . . . less than human," "disgusting," and "out of control." *Id.* at 918. He would wash his soiled clothing "in the mop closet so that [he] didn't get in trouble for washing them off in the shower, and then [he'd] throw them in the washer and dryer." *Id.*

Mr. Womble wore boots unless he was in the shower, where he would wear his "shower shoes." *Id.* He "ma[d]e sure" to "have [his] boots on" when he went to the toilets "because of the general condition[s]" there caused by overflowing toilets. *Id.*[16] He also rolled up his pants when using the toilets.

Mr. Womble identified three other issues regarding the A-South facilities. First, by the fall of 2014, the toilets sometimes lacked light bulbs and thus would be "pitch black" at "nighttime," which caused him to "have to generally feel around and sit on the toilet." *Id.*[17] Second, the shower drains were frequently clogged with hair or bars of soap. Third, at certain times of day there would be long waits to use the showers.

---

[16] Mr. Chrisman testified in his deposition that when "some type of flooding" occurred in a bathroom, "the officer would direct the offender population that were required to clean to take care of that, mop it up, squeegee it, whatever." App., Vol. 6 at 1406. But it is unclear whether the clean-up responses were rapid or effective.

[17] A reasonable jury could infer that the lack of adequate lighting increased Mr. Womble's risk of exposure to feces.

23

In determining whether a reasonable jury could find from this evidence that Mr. Womble's conditions of confinement were sufficiently serious so as to deprive him "of the minimal civilized measure of life's necessities," *Shannon*, 257 F.3d at 1168 (quotations omitted), we "consider the conditions of confinement as a whole because several deprivations in combination may constitute a constitutional violation when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need," *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996) (quotations omitted).

As previously noted, inmate exposure to human waste presents a unique and serious Eighth Amendment concern. *See McBride*, 240 F.3d at 1292; *DeSpain*, 264 F.3d at 974. We conclude that Mr. Womble established a triable issue on the objective component of an Eighth Amendment violation based on the regular presence of feces on the floors of the toilets due to clogging and overflowing, the lack of adequate lighting in the toilet areas, and the inadequacy of the toilets-to-inmates ratio.[18]

In reaching this conclusion, we reject the district court's reliance on work orders purporting to show the reporting and repair of toilet and shower issues at

---

[18] At oral argument, Defendants' counsel noted that neither Defendant was employed at MACC after June 2015. Oral Argument at 19:00-19:35, *Womble v. Chrisman*, No. 24-7061 (10th Cir. Mar. 16, 2026), ca10.uscourts.gov/sites/ca10/files/oralarguments/24-7061.mp3. But Mr. Womble's evidence, as we have discussed, indicates that the facilities issues occurred during the time that both Defendants worked at MACC.

MACC.  The work orders indicated that MACC's maintenance staff often made repairs within one day.  But Mr. Womble testified that he and other inmates lacked the ability to submit written work orders.  Instead, inmates could only report issues to MACC staff and then "just hope" that they in turn would put in a written work order.  App., Vol. 4 at 917.  Based on Mr. Womble's testimony, which Defendants do not dispute, a reasonable jury could infer that toilet and shower malfunctions did not necessarily lead to submission of a timely written work orders to MACC's maintenance staff, and that some issues went unreported and thus unresolved.[19]  We conclude that the written work orders do not eliminate a genuine factual issue regarding toilet conditions in the A-South Unit.

    ii.  <u>Subjective component</u>

On the subjective component, Mr. Womble points to (1) Defendants' regularly walking the facility (Mr. Chrisman admitted he did so daily) and personally observing the "open and obvious" conditions of the toilets and showers, App., Vol. 4 at 917, 982-83; (2) Mr. Chrisman's concession in his deposition that toilet flooding occurred on A-South, causing urine and feces to be on the toilet floors; (3) Mr. Womble's speaking with both Defendants "in August and October 2014" and informing them he "was being exposed to feces," to which they responded that "nothing can be done," "[t]his is a permanent situation," and "[y]ou'll just have to do

---

    [19] Mr. Womble testified that the toilet and shower issues "got worse" over time.  App., Vol. 4 at 919; *see id.* at 981 (stating that "these problems were either not fixed or maintenance was delayed," and "[e]ven when maintenance repaired the reported issues, the toilets and showers often quickly failed again").

your time," *id.* at 982; (4) his filing RTSs and grievances in May and July 2014 highlighting the toilet problems; and (5) evidence from the Oklahoma Department of Corrections' ("DOC") Rule 30(b)(6) witness that Defendants could have, but failed to, request additional funding from DOC in 2014 or 2015.

The district court effectively rejected that Mr. Chrisman was aware of the toilet and shower conditions. It concluded: "Mr. Womble offers nothing that could demonstrate Mr. Chrisman encountered *and* ignored the alleged conditions while walking the A-South unit." App., Vol. 6 at 1469. But this overlooks that Mr. Chrisman admitted the toilets were sometimes clogged and caused urine and feces to overflow onto the floors, Mr. Womble's testimony that these issues occurred regularly and increased over time, and his testimony that after he informed Mr. Chrisman about these issues, Mr. Chrisman stated that nothing could be done.

The same goes for Mr. Sharp. Although the district court concluded there was no evidence that he "was aware of the alleged conditions," *id.*, Mr. Womble testified that Mr. Sharp also regularly visited A-South, observed the toilets and showers, was informed by Mr. Womble of the issues, and told Mr. Womble nothing could be done.

The district court acknowledged Mr. Womble's testimony "that he unsuccessfully raised verbal complaints with Defendants regarding exposure to human waste." *Id.* at 1470. It then stated, "While this fact is disputed, the Court concludes that no reasonable juror could find in Mr. Womble's favor in light of additional conflicting evidence proffered by Defendants." *Id.* But the court did not identify the "additional conflicting evidence." And it erred by resolving disputed

issues of material fact in favor of Defendants because "[w]e view the evidence in the light most favorable to the nonmoving party, resolving all disputed facts and making all reasonable inferences in his favor." *Jiang v. City of Tulsa*, — F.4th —, —, 2026 WL 741188, at *3 (10th Cir. Mar. 17, 2026).[20]

We conclude that Mr. Womble's evidence was sufficient to create a genuine issue of material fact regarding whether Defendants knew about unsanitary conditions of confinement and failed to take reasonable measures to abate those conditions. *See Hunt*, 199 F.3d at 1224. Although Defendants took some measures to address overflowing and clogged toilets, a reasonable jury could find that those measures were inadequate and that Defendants knew so given the persistence of the toilet overflow problem.

\* \* \* \*

Mr. Womble has established a genuine issue of material fact on (1) the objective component based on his exposure to human waste and the attendant health risks, and (2) the subjective component based on the Defendants' awareness and disregard of the toilet overflow problem. We therefore reverse the district court's grant of summary judgment to the Defendants on the inadequate-facilities claim.

---

[20] *See also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) ("When the record shows an unresolved dispute of historical fact relevant to" the qualified immunity "analysis, a motion for summary judgment based on qualified immunity should be properly denied" (quotations omitted)).

C. *Award of Costs*

In Appeal No. 25-7028, Mr. Womble challenges the district court's grant of costs under 28 U.S.C. § 1920. Because we reverse on the inadequate-facilities claim, and "[b]ecause we are remanding this case for further proceedings, the 'prevailing party' has yet to be established, and thus we necessarily must vacate the district court's award of costs." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1095 (10th Cir. 2006) (affirming in part and reversing in part the district court's grant of summary judgment in favor of defendants and vacating the district court's cost award in favor of defendants).

## III.  CONCLUSION

In Appeal No. 24-7061, we (1) affirm the district court's grant of summary judgment in favor of Defendants on Mr. Womble's Eighth Amendment inadequate-nutrition claim, (2) reverse the district court's grant of summary judgment in favor of Defendants on Mr. Womble's Eighth Amendment inadequate-facilities claim, and (3) remand for further proceedings consistent with this opinion.

In Appeal No. 25-7028, we remand with instructions to vacate the award of costs in favor of Defendants.

28